CRAIG H. MILLET, SBN 106027, cmillet@gibsondunn.com
ROBERT E. PALMER, SBN 116892, rpalmer@gibsondunn.com
KENNETH A. GLOWACKI JR., SBN 217762, kglowacki@gibsondunn.com
LINDA D. LAM, SBN 229780, llam@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive
Irvine, CA 92612-4412
Telephone: 949.451.3800
Facsimile: 949.451.4220

Attorneys for Plaintiff
Angus Petroleum Corporation

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>SOUTH COAST OIL CORPORATION, a Delaware corporation, Substantively Consolidated with SOUTH COAST CORPORATION, a Utah corporation,<br><br>        Debtors.<br><br>ANGUS PETROLEUM CORPORATION, a Delaware corporation,<br><br>        Plaintiff,<br><br>        v.<br><br>BOB GRAYSON, an individual; BG OPERATIONS, LLC, a California limited liability company; and GRAYSON SERVICES, INC., a California corporation,<br><br>        Defendants. | CASE NO.: 8:07-bk-12994-TA<br><br>Chapter 11<br><br>Adv. No. _____<br><br>**COMPLAINT FOR:**<br><br>**(1) DECLARATORY RELIEF;**<br>**(2) INJUNCTIVE RELIEF; AND**<br>**(3) INJUNCTIVE RELIEF EXTENDING THE STAY**<br><br>**Hearing:**<br>Date:     [TBD by Summons]<br>Time:     [TBD by Summons]<br>Place:    Courtroom 5B<br>           Ronald Reagan Fed. Bldg.<br>           411 W. Fourth Street<br>           Santa Ana, CA 92701<br>Judge:   Hon. Theodor C. Albert |

1    **TO THE HONORABLE THEODOR C. ALBERT, UNITED STATES**

2    **BANKRUPTCY JUDGE:**

3          Plaintiff Angus Petroleum Corporation, a Delaware corporation ("Angus"), by and through its

4    attorneys of record, alleges its Complaint against Defendants Bob Grayson ("Grayson"), Grayson

5    Services, Inc. ("Grayson Services"), and BG Operations, LLC ("BG", together with Grayson and

6    Grayson Services, the "Defendants") as follows:

7    **JURISDICTION AND VENUE**

8         1.    This Bankruptcy Court has jurisdiction over the subject matter of this adversary action

9    based upon the express language of the Modification Agreement (defined below) between Angus and

10   BG, which was ratified by the Trustee (defined below), approved by this Bankruptcy Court, and

11   provides in pertinent part that: "the Bankruptcy Court in the SCOC case shall have ***sole and exclusive***

12   ***jurisdiction*** to determine any dispute under the [Independent Contractor Agreement] or this

13   modification." Mod. Agmt. ¶ 11 (emphasis added).

14        2.    This Court also has jurisdiction over the subject matter of this adversary proceeding

15   based on 28 U.S.C. §1334(b).

16        3.    This adversary proceeding is a core proceeding pursuant to Sections 28 U.S.C.

17   §§ 157(b)(2)(A), 157(b)(2)(M), and 157(b)(2)(O).

18        4.    Venue is based on 28 U.S.C. § 1409(a), as Debtor South Coast Oil Corporation's

19   ("SCOC") bankruptcy case is still pending.

20        5.    This Complaint initiates an adversary proceeding within the meaning of Rules 7001(7)

21   and 7001(9) of the Federal Rules of Bankruptcy Procedure.

22   **PARTIES**

23        6.    Angus is, and at all times relevant to the allegations in this Complaint was, a

24   corporation organized and existing under the laws of the State of Delaware, qualified and authorized

25   to do business under the laws of the State of California, and doing business with its principal place of

26   business in the City of Huntington Beach, California.

27

28

Gibson, Dunn &
Crutcher LLP

7.  James J. Joseph is the duly appointed Chapter 11 Trustee (the "Trustee") for the Bankruptcy Estate of South Coast Oil Corporation, Bankruptcy Case No. 8:07-bk-12994-TA (the "SCOC Bankruptcy Estate").

8.  On June 4, 2004, SCOC acquired 100% of the stock of Angus.  Since the commencement of SCOC's Chapter 11 case on September 19, 2007, Angus has been wholly-owned by the SCOC Bankruptcy Estate.

9.  Angus is informed and believes, and on that basis alleges, that Grayson is, and at all times relevant to the allegations in this Complaint was, an individual residing in the city of Bakersfield, California, and the President and owner of BG.

10.  Angus is informed and believes, and on that basis alleges, that BG is, and at all times relevant to the allegations in this Complaint was, a limited liability company organized and existing under the laws of the State of California, with a principal place of business located at 4004 S. Enos Lane, Bakersfield, California.

11.  Angus is informed and believes, and on that basis alleges, that Grayson Services is, and at all relevant times to the allegations in this Complaint was, a corporation organized and existing under the laws of the State of California, with a principal place of business located at 4004 S. Enos Lane, Bakersfield, California.

## PRELIMINARY STATEMENT

12.  By this Complaint, Angus seeks a declaration of the legal rights, duties, obligations, and relationships between and among the parties to this Complaint pursuant to the: (a) the Independent Contractor Agreement dated May 1, 2007 (the "IC Agreement"); (b) Modification Agreement dated August 16, 2009, which modified the IC Agreement (the "Modification Agreement"); and (c) Joint Interest Agreement dated December 22, 2010.  The IC Agreement and Modification Agreement were entered into by and between Angus and BG.  The Joint Interest Agreement was entered into by and between Angus, BG, Grayson Services, and Grayson, with Douglas L. Mahaffey ("Mahaffey") of Mahaffey & Associates signing as the attorney for each of Angus, BG, Grayson Services, and Grayson.  The IC Agreement, Modification Agreement, and Joint Interest Agreement exclusively govern the parties' relationships with respect to Angus and the SU

Gibson, Dunn &
Crutcher LLP

Facility (defined below).  Copies of the IC Agreement, Modification Agreement, and Joint Interest

Agreement are appended hereto as **Exhibits A, B** and **C**, respectively.

13.    By this Complaint, Angus seeks:

(a)    a declaration that the IC Agreement and Modification Agreement: (i) created

an independent contractor and debtor-creditor relationship between Angus and BG; (ii) did

not assign the Operating Agreement to BG; and (iii) did not form any joint venture,

partnership, or other type of entity owned jointly by Angus and BG, or any other relationship

between Angus and BG, that vested in BG or Grayson any type of ownership in or corporate

control over Angus;

(b)    a declaration that the Joint Interest Agreement: (i) created a mere contractual

relationship between Angus, BG, Grayson Services, and Grayson pursuant to which the

parties agreed that the exchange of information and documents and joint communications and

discussions in defense of the Order for Removal, Mitigation or Prevention of a Substantial

Threat of Oil Discharge No. OPA 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-0001 (the "Order for Removal" or "EPA

Claim"); (ii) would not cause a waiver of the attorney-client privilege or work product

doctrine; (iii) did not form any joint venture, partnership, or other type of entity owned jointly

by Angus and BG, or any other relationship between Angus, BG, Grayson Services and

Grayson, that vested in BG, Grayson Services or Grayson any type of ownership in or

corporate control over Angus;

(c)    that Defendants and their agents should be enjoined from representing to any

party or entity, including any court, that they are partners, joint ventures, general managers, or

otherwise in any manner involved in a business arrangement with Angus other than as an

independent contractor retained by Angus to provide certain services under the IC Agreement

or Modification Agreement, or a party to which an agreement has been executed relating to

the treatment of information, documents, and communications under the Joint Interest

Agreement and which has now been terminated; and

(d)    that the automatic stay be extended on a limited basis to stay Defendants from

taking any action against or purportedly on behalf of Angus or its assets that is not

Gibson, Dunn &
Crutcher LLP

1    contemplated under the IC Agreement, Modification Agreement, and Joint Interest

2    Agreement.

3                                    **GENERAL ALLEGATIONS**

4           14.     Pursuant to an operating agreement dated June 1, 1989 (the "Operating Agreement")

5    by and between Angus and Columbia Gas Development Corporation, Angus is the 50% owner and

6    sole operator of a water flood oil production facility located in Huntington Beach, California, known

7    as the Springfield Unit Facility (the "SU Facility").  IC Agmt. § 1, Ex. 1.

8           15.     In early 2007, Angus lacked adequate capital to operate the SU Facility and faced its

9    own potential bankruptcy.  Also, the Division of Oil and Gas and Geothermal Resources ("DOGGR")

10   had ordered Angus to abandon the SU Facility, plug its wells, and return the surface area to raw land.

11                          **THE INDEPENDENT CONTRACTOR AGREEMENT**

12          16.     Against this backdrop, on May 1, 2007, BG and Angus entered into the IC Agreement

13   pursuant to which BG, through its owner and manager, Grayson, agreed to, *inter alia*:  (a) "perform

14   all duties and obligations as required under [the Operating Agreement] to the extent they are

15   consistent with good oil field practices,"  IC Agmt. § 2; (b) advance all expenses required for the

16   operations of the [SU Facility], including but not limited to payment of employee expenses, pumper

17   expenses, mechanic expenses, parts and materials, regulatory compliance expenses, legal fees and

18   other necessary expenses" to the extent that Angus could not, IC Agmt. § 3(A); (c) "provide and

19   advance all monies necessary to obtain any equipment, rigs, parts or material necessary to repair and

20   return to production the [SU Facility]," IC Agmt. § 3(B); and (d) "maintain sufficient personnel at

21   facility to operate it on a daily basis, and maintain the equipment facilities in good working

22   condition," IC Agmt. § 8.

23          17.     In return, the IC Agreement obligates Angus to, *inter alia*:  (a) convey to BG "25% of

24   the net revenue received from [Angus] from any production of hydrocarbons or from any sale

25   proceeds from the sale of [Angus] stock or assets, in part or in full, to any third person," IC Agmt.

26   § 3; and (b) reimburse operating expenses advanced by BG "[w]hen and if [Angus] has sufficient

27   operating capital to cover its existing liabilities and pay for ordinary operations," IC Agmt. § 6.

28

Gibson, Dunn &
Crutcher LLP

18.     The IC Agreement expressly provides that BG is an ***independent contractor*** hired by Angus to operate the SU Facility and has a contractual right to share in Angus' net profits generated from the operation of the SU Facility or from Angus' sale of stock or assets.  Moreover, the Operating Agreement, which is attached as Exhibit 1 to the IC Agreement and incorporated therein, provides as follows: "The liability of the parties shall be joint and several, not joint or collective....It is not the intention of the parties to enter, nor shall this agreement be construed as creating, a mining or other partnership or association, or to render the parties liable as partners." IC Agmt., Exh. 1, Art. VII.A.

19.     Other than this independent contractor and debtor-creditor relationship described in the preceding paragraph, the IC Agreement creates no additional relationship, rights, duties, or obligations between BG, Grayson, and Angus, nor does it assign Angus' interest in the Operating Agreement to BG or Grayson.

20.     Angus is informed and believes, and on that basis alleges, that the IC Agreement was drafted on behalf of Angus and BG by the same attorney, Mahaffey.

### SCOC'S BANKRUPTCY CASE

21.     On September 19, 2007, three petitioning creditors, including BG, placed SCOC into an involuntary Chapter 11 bankruptcy proceeding.

22.     In or about December 2007, pursuant to a motion by the petitioning creditors, the Bankruptcy Court appointed the Trustee to administer the SCOC Bankruptcy Estate.

### THE MODIFICATION AGREEMENT

23.     From the time of the IC Agreement's execution to approximately early 2009, "BG claimed to have advanced not less than $625,000.00 under paragraph 3A of the [IC] Agreement...but [was] unwilling to voluntarily make additional advances without certain modifications and clarifications to the [IC] Agreement and ratification by the sole shareholder of Angus," which at this point was the Trustee of the SCOC Bankruptcy Estate.  Mod. Agmt. ¶ E.

24.     Because Angus was "at a critical juncture...with operation of the [SU] Facility and require[d] additional funds...to pay expenses to preserve the [SU] Facility, including unpaid real

property taxes," Angus and BG negotiated and entered into the Modification Agreement.  Mod. Agmt. ¶ F.

25.    The Modification Agreement modifies the IC Agreement in various respects, including the following:  (a) BG's advances through a date certain are affirmed and accrue interest at 10% per annum, Mod. Agmt. ¶ 2; (b) BG is entitled to repayment of advances from Angus's recovery of money or assets (if any) from various third parties (including DOGGR), Mod. Agmt. ¶ 3; (c) it adjusts BG's and Angus' rights under the IC Agreement if BG acquires rights in the SU Facility from a third party, Mod. Agmt. ¶¶ 5 & 6; (d) if Angus initiates future actions against various third parties (including DOGGR), "*then Angus shall use its best efforts to agree with the Law Offices of Douglas Mahaffey that said Firm represent Angus on a mutually acceptable contingency fee basis*," Mod. Agmt. ¶ 8 (emphasis added); (e) it specifies: (i) a methodology of determining the fair market value of any real estate interests sold by Angus; and (ii) BG's interest in the proceeds of any such sale, Mod. Agmt. ¶¶ 9 & 10; and (f) it expressly reaffirms that "*[t]he stock of Angus is wholly owned by the South Coast Oil Corporation bankruptcy estate*" and that "*Angus and BG therefore agree that the Bankruptcy Court in the SCOC case shall have sole and exclusive jurisdiction to determine any dispute under the [IC] Agreement or this modification*," Mod. Agmt. ¶ 11 (emphasis added).

26.    On July 30, 2009, this Bankruptcy Court entered the *Order Granting Motion For Order Authorizing Use Of Property Of The Estate – Voting Stock Of Angus Petroleum Corporation* (Bk. Doc. 178) authorizing the Trustee of the SCOC Bankruptcy Estate to ratify the Modification Agreement.  BG and Angus executed the Modification on July 7, 2009 and August 15, 2009, respectively.  The Modification Agreement was ratified by the Trustee.

27.    Angus is informed and believes, and on that basis alleges, that the Modification Agreement was drafted on behalf of both Angus and BG by the same attorney, Mahaffey.

28.    The Modification Agreement provides that BG: (a) is an *independent contractor* hired by Angus to operate the SU Facility; and (b) has a contractual right to share in Angus' net profits generated from the operation of the SU Facility or from Angus' sale of stock or assets.

Gibson, Dunn &
Crutcher LLP

29.    Other than this independent contractor and creditor-debtor relationship, the

Modification Agreement creates no additional relationship, rights, duties, or obligations between BG

and Angus, nor does it assign Angus' interest in the Operating Agreement to BG.

## THE JOINT INTEREST AGREEMENT

30.    On January 21, 2010, an oil spill occurred at the SU Facility.  In that same month, the

United States Environmental Protection Agency ("EPA") issued the Order for Removal and alleged

thereunder that, as the operator and 50% owner of the SU Facility, Angus is liable for the oil spill (the

"EPA Claim").  In addition to Angus, the Order for Removal is also binding on Angus' directors,

officers, employees, agents, trustees, successors, parent company, subsidiaries, and assigns.  Joint

Interest Agmt. at 1.

31.    In relation to the Order for Removal, the United States Coast Guard sent Angus a

letter dated November 10, 2010, setting forth the amount it incurred responding to the spill, which

totaled $1,567,481.74 ("Coast Guard Claim").

32.    At the time of the oil spill, BG was performing certain duties at the SU Facility

pursuant to the IC Agreement and, in that capacity, was acting as an agent of Angus.  As such, BG is

also liable under the Order for Removal and the Coast Guard Claim.

33.    Both the EPA Claim and Coast Guard Claim were tendered to The Travelers-St. Paul

Insurance Company on behalf of Angus and BG.  Joint Interest Agmt. at 1.

34.    Under the Joint Interest Agreement, Angus and BG agreed: (i) that they have a joint

interest in…working together to minimize or eliminate exposure from the EPA Claim; (ii) ensuring

that Travelers performs its obligations under the policy and defends and indemnifies both Angus and

BG from the EPA Claim; and (iii) that "JIA Information" exchanged between the parties would be

treated as "privileged and confidential."  Joint Interest Agmt. at 2, ¶¶ 1, 3.

35.    The Joint Interest Agreement also states that Mahaffey may continue to represent

Angus and BG in matters in which Mahaffey was already representing Angus and BG.  Joint Interest

Agmt. ¶ 10.  Angus is informed and believes, and on that basis alleges, that the Joint Interest

Agreement was drafted on behalf of Angus, BG, Grayson Services, and Grayson by the same

attorney, Mahaffey.

Gibson, Dunn &
Crutcher LLP

36.     Angus, BG, Grayson Services, and Grayson expressly agreed that the Joint Interest Agreement would not "be used as evidence in any hearing, action and proceeding against any and all of the Parties, except for the interpretation of the [Joint Interest Agreement] itself...." Joint Interest Agmt. at 3, ¶ 7.

37.     Pursuant to Paragraph 12 of the Joint Interest Agreement, "[a]ny Party may withdraw from this agreement...." Joint Interest Agmt. at 4, ¶ 12.  On June 14, 2011, Angus formally withdrew from the Joint Interest Agreement.

## THE CALIFORNIA STATE COURT ACTIONS

38.     As of May 16, 2011, Mahaffey was counsel of record for Angus in the following matters:

(a)     *BG Operations, LLC v. XTO Offshore, Inc.*, Case No. 30-2009-00122075, pending before the Honorable Kim G. Dunning in the Orange County Superior Court for the State of California (the "XTO Litigation");

(b)     *Angus Petroleum Corp. v. Blackstone Oil & Gas, Inc.*, Case No. 30-2010-00413476, pending before the Honorable Charles Margines in the Orange County Superior Court for the State of California (the "Blackstone Litigation"); and

(c)     *Angus Petroleum Corp. v. Lear*, Case No. 30-2010-00404791, pending before the Honorable Andrew P. Banks in the Orange County Superior Court for the State of California (the "Lear Litigation").

## A.   XTO Litigation

39.     On May 17, 2011, Angus, through its Board of Directors, sent a letter to Mahaffey terminating his representation of Angus as to all litigation involving Angus, and requested that Mahaffey sign a substitution of counsel form enclosed therein for the XTO Litigation.  Mahaffey refused to sign the substitution of counsel form or otherwise agree to step down as counsel for Angus.

40.     On May 31, 2011, Angus, through its counsel Robert E. Palmer of Gibson, Dunn & Crutcher LLP, appeared *ex parte* in the XTO Litigation to remove Mahaffey as counsel of record for Angus and to confirm that Mr. Palmer will appear as counsel of record for Angus in the XTO

1   Litigation.  A copy of the May 31, 2011 hearing transcript ("XTO Tr.") is attached hereto as **Exhibit**

2   **D**.

3         41.   At the *ex parte* hearing, Mahaffey stated to the Court that he was appearing "on behalf

4   of Angus Petroleum" and also on behalf "of the BG Operations, Angus Joint Venture."  XTO Tr. at

5   3:5-6, 3:13-15.  Mark C. Bailey also appeared at the hearing, "specially appearing for BG Operations

6   and Bob Grayson."  XTO Tr. at 3:10-12.

7         42.   Mahaffey made the following statements on the record before Judge Dunning

8   regarding alleged relationships between Angus, BG and Grayson:

9            (a)   "I think it's imperative that, at least for the sake of this record, BG Operations

10         and Angus formed a partnership," XTO Tr. at 4:25-5:2;

11            (b)   that the IC Agreement provided Grayson with the authority to designate who

12         represents Angus for all current and future litigation, XTO Tr. at 10:11-11:13;

13            (c)   that the Modification Agreement provides that Grayson is to fund and handle

14         Angus litigation, including the XTO Litigation, XTO Tr. at 11:21-12:26;

15            (d)   that there is a separate "2007 25 percent, 75 percent profit splitting, expense

16         splitting capital venture partnership that has been carried on for four years," XTO Tr. at

17         23:23-24:8; and

18            (e)   that the formal interpretation of the IC Agreement and Modification

19         Agreement should be determined by the bankruptcy court, XTO Tr. 16:6-17:23.

20         43.   Mr. Bailey, as "special counsel" to BG and Grayson, stated, "Angus, as I understand

21   it, is in a joint venture partnership with BG Operations."  Tr. at 20:16-20:25.

22         44.   Following a substantial hearing, comments by the Trustee in response to the Court's

23   questions, the review of substantial evidence (including declarations and exhibits), and arguments of

24   counsel, Judge Dunning ordered Mahaffey removed and Gibson Dunn & Crutcher LLP added as

25   counsel of record for Angus in the XTO Litigation, and further ordered the transfer of files from

26   Mahaffey to Mr. Palmer.  A copy of the May 31, 2011 Minute Order is attached hereto as **Exhibit E**.

27

28

**B.**    **Blackstone Litigation**

45.    On June 3, 2011, Linda D. Lam of Gibson, Dunn & Crutcher LLP sent a letter to Mahaffey requesting that Mahaffey sign the substitution of counsel form enclosed therein for the Blackstone Litigation.  Mahaffey refused to do so.

46.    On June 9, 2011, Angus, through its counsel Robert E. Palmer of Gibson, Dunn & Crutcher LLP, appeared *ex parte* in the Blackstone Litigation to remove Mahaffey as counsel of record for Angus and to confirm that Mr. Palmer will appear as counsel of record for Angus in the Blackstone Litigation.  A copy of the June 9, 2011 hearing transcript ("Blackstone Tr.") is attached hereto as **Exhibit F**.

47.    At the *ex parte* hearing, Mahaffey stated to the Court that he was appearing "on behalf of [Angus, BG, Grayson] and the joint venture between them."  Blackstone Tr. at 3:5-6, 3:13-15.  Mr. Bailey also appeared at the hearing, "specially appearing for Bob Grayson and BG Operations."  XTO Tr. at 3:10-12.

48.    Mahaffey made the following statements on the record before Judge Margines regarding the alleged relationship between Angus, BG, and Grayson:

(a)    that Grayson's ability to control the hiring and firing of counsel in the Blackstone Litigation is based on the IC Agreement, Modification Agreement, and Joint Interest Agreement, Blackstone Tr. at 3:26-4:9;

(b)    that Section 8 of the Modification Agreement "confirms the partnership control of Mr. Grayson over litigation," Blackstone Tr. at 4:10-5:7;

(c)    that the "partnership" has the authority to hire and fire counsel, Blackstone Tr. 8:21-9:3;

(d)    that Grayson has a "25 percent working ownership of the leasehold estate that Angus Petroleum Company owns and has absolutely no existence without.  It's partnership property….Mr. Grayson and Angus Petroleum Corporation acquired partnership property….," Blackstone Tr. at 24:18-25:6; and

(e)    that, pursuant to California Corporations Code Sections 16001 and/or 16201, parties that split profits are partners, Blackstone Tr. at 34:25-35:36:7; 48:9-19.

49.     Mr. Bailey, as "special counsel" to BG and Grayson, stated, "[m]y clients believe that there is a partnership.  Furthermore, my clients believe that this particular litigation that's pending before this court is partnership property."  Blackstone Tr. at 42:21-24.

50.     Following arguments of counsel, Judge Margines ordered Mahaffey removed as counsel of record for Angus in the Blackstone Litigation and that Gibson Dunn be allowed to take over the representation of Angus as counsel of record.  A copy of the June 15, 2011 Order is attached hereto as **Exhibit G**.

**C.    Lear Litigation**

51.     On June 3, 2011, Ms. Lam sent a letter to Mahaffey requesting that Mahaffey sign the substitution of counsel form enclosed therein for the Lear Litigation.  Mahaffey refused to do so.

52.     On June 7, 2011, Angus, through its counsel Robert E. Palmer of Gibson, Dunn & Crutcher LLP, appeared *ex parte* in the Lear Litigation to remove Mahaffey as counsel of record for Angus and to confirm that Mr. Palmer will appear as counsel of record for Angus in the Lear Litigation.  A copy of the June 7, 2011 hearing transcript ("Lear Tr.") is attached hereto as **Exhibit H**.

53.     At the *ex parte* hearing, Mahaffey stated to the court that he was appearing "on behalf of BG Operations, Inc., as in a joint venture, which is really the real party in interest….call it the Angus BG Joint Venture."  Lear Tr. at 2:17-20.  Mr. Bailey was also present, "specially appearing for Bob Grayson and BG Operations."  Lear Tr. at 2:21-22.

54.     Mahaffey also stated on the record that he (Mahaffey) had access to certain sensitive documents because he has "been the attorney for Angus and the joint venture" for four years, Lear Tr. at 4:10-5:2.

55.     Following arguments of counsel, Judge Banks ordered that the case be stayed and denied the *ex parte* application without prejudice and instead advised the parties to proceed via a regularly noticed motion to be heard on his "first available" court day -- December 2, 1011.  Thus, despite the fact that Angus terminated Mahaffey's legal services on May 17, 2011, Mahaffey has refused to execute a substitution of counsel and remains counsel of record for Angus in the Lear Litigation.

Gibson, Dunn &
Crutcher LLP

**THE PARTIES' CONTENTIONS**

56.    Angus is informed and believes, and on that basis alleges, that Defendants contend that the IC Agreement, Modification Agreement, and Joint Interest Agreement: (1) granted them ownership in and control of Angus without transferring to them any stock in Angus; (2) granted them the right to control Angus and all litigation to which it is a party; and/or (3) created a separate legal entity between Angus and BG Operations, Grayson, and/or by implication, Grayson Services, that is controlled by Defendants.

57.    Angus is informed and believes, and on that basis alleges, that BG, Grayson, and by implication, Grayson Services, hold themselves out to third parties, including the courts, as an owner of Angus and not simply an independent contractor and creditor, and/or as parties having the authority to control Angus.

58.    Angus contends that any relationships, rights, duties, or obligations between it and Defendants relating to Angus and the SU Facility are governed exclusively by the IC Agreement and the Modification Agreement, and that these agreements accurately reflect: (a) that BG is/was an independent contractor hired by Angus to operate the SU Facility for a period of time with a contractual right to share in Angus' net profits generated from the SU Facility; and (b) Grayson is the owner of the independent contractor (BG).  Except as expressly mentioned, no other legal rights, business combination, ownership, or control in or with Angus was created by the IC Agreement and the Modification Agreement.

59.    Angus contends that the Joint Interest Agreement between Angus, BG, Grayson Services, and Grayson is nothing more than an agreement to treat information, documents, and communications shared among the parties regarding the EPA Claim and Coast Guard Claim as confidential information subject to the attorney-client privilege and work product.  Angus further contends that, in any event, the Joint Interest Agreement has been terminated.

**FIRST CLAIM FOR RELIEF**

**(Declaratory Relief against All Defendants)**

60.    Angus refers to and incorporates herein by reference all the allegations contained in paragraphs 1 through 59, inclusive, of this Complaint as though set forth fully herein.

61.    An actual controversy now exists between Angus and BG, Grayson Services, and Grayson concerning their respective rights, duties, obligations, and relationships under the IC Agreement, Modification Agreement, and Joint Interest Agreement.

62.    A declaration of the rights, duties, obligations, and relationships of the parties under the IC Agreement, Modification Agreement, and Joint Interest Agreement is appropriate at this time in order to resolve the current controversy and to establish what authority, if any, BG, Grayson Services, and Grayson have: (a) over Angus and/or its assets; or (b) to appear in and control litigation to which Angus is a party.  The continuing unfounded contentions by BG, Grayson Services, and Grayson are disruptive to the business of Angus and are damaging the value of its assets, and hence, the property of the SCOC Bankruptcy Estate.

63.    Angus desires a judicial determination and declaration of the rights, duties, obligations, and relationships of the parties under the IC Agreement and Modification Agreement, and specifically that such agreements: (a) do not create *any* relationship, rights, duties, or obligations between Angus and BG and Grayson *other* than those between a principal and independent contractor, respectively; (b) do not give rise to any rights of BG and Grayson as a joint venturer, partner, general manager, shareholder, owner, director, or officer of Angus, including with respect to the SU Facility; and (c) do not, constitute, or memorialize any assignment or transfer of the Operating Agreement by Angus to BG and/or Grayson.

64.    Angus further desires a judicial determination and declaration of the rights, duties, obligations, and relationships of the parties under the Joint Interest Agreement, and specifically that such agreement: (a) does not create any relationship, rights, duties, or obligations between Angus and BG, Grayson Services, and Grayson other than a contractual relationship in which the parties agreed that certain information, documents, and communications shared between the parties would be protected by the attorney-client privilege and work product doctrine; and (b) does not give rise to any rights of BG, Grayson Services, or Grayson as a joint venturer, partner, general manager, shareholder, owner, director, or officer of Angus, including with respect to the SU Facility.

Gibson, Dunn &
Crutcher LLP

## SECOND CLAIM FOR RELIEF

### (Injunctive Relief against All Defendants)

65.     Angus refers to and incorporates herein by reference all the allegations contained in paragraphs 1 through 64, inclusive, of this Complaint as though set forth fully herein.

66.     Angus is informed and believes, and on that basis alleges, that Defendants assert, have taken actions, and have represented to third parties, including courts, that they are "part owners" of either Angus or the SU Facility via a partnership or otherwise, and/or that they have control over Angus or the SU Facility.

67.     In addition to being untrue and misleading to third parties, Defendants' fabrications regarding their ownership or control interests in either Angus or the SU Facility are irreparably damaging to both Angus and its sole owner, the SCOC Bankruptcy Estate.  BG Operations and Grayson, in refusing to recognize the authority of Angus' current management, has supported Mahaffey in his threats to pursue litigation on behalf of Angus, though he has no right to do so, to the detriment of Angus and the SCOC Bankruptcy Estate.

68.     Based on the foregoing, Angus seeks an injunction pursuant to Section 105(a) of the Bankruptcy Code and/or Rule 7065 of the Federal Rules of Bankruptcy Procedure prohibiting BG, Grayson Services, Grayson, and any others acting in concert with or on any of their behalves, from: (a) representing to any party or entity, including any court, that any of them are partners, joint ventures, general managers, owners, shareholders, directors, officers, assignees, or otherwise hold any interest in Angus or have any authority to represent or control Angus or its affairs; and/or (b) from asserting control or authority over any assets or affairs of Angus to the same extent provided in Section 362 of the Bankruptcy Code.

## THIRD CLAIM FOR RELIEF

### (Injunctive Relief Extending the Stay to Cover Angus and the SU Facility as to All Defendants)

69.     Angus refers to and incorporates herein by reference all the allegations contained in paragraphs 1 through 68, inclusive, of this Complaint as though set forth fully herein.

Gibson, Dunn &
Crutcher LLP

70.    Angus is informed and believes, and on that basis alleges, that Defendants have improperly taken actions to claim ownership and control over Angus, its property and its affairs including without limitation, ownership, and/or control of the SU Facility.

71.    The stock of Angus constitutes "property of the estate" as defined under Bankruptcy Code Section 541(a). The stock of Angus represents the single most significant asset of the SCOC Bankruptcy Estate. The business of Angus and the value of its property directly impact the value of the Angus stock solely held by the SCOC Bankruptcy Estate and, therefore, interference in the business and the property of Angus directly affects property of the SCOC Bankruptcy Estate.

72.    Defendants' assertion of ownership and exertion of control over Angus and/or the SU Facility irreparably damages the value of the Angus stock, and thus the value of the SCOC Bankruptcy Estate, thereby substantially interfering with SCOC's reorganization.

73.    Actions taken that interfere in the business and the property of Angus which directly affect the property of the SCOC Bankruptcy Estate are automatically stayed by operation of Section 362(a) of the Bankruptcy Code.

74.    Based on the foregoing, Angus requests that this Court, pursuant to Sections 362(a) and/or 105(a) of the Bankruptcy Code, extend the bankruptcy stay on a limited basis to bar Defendants and their agents from: (a) taking any action against or on behalf of Angus or the SU Facility that is not contemplated under the IC Agreement, Modification Agreement, or Joint Interest Agreement; and (b) asserting ownership over, attempting to obtain possession of, or exercising control over Angus and its property, including without limitation the SU Facility.

**WHEREFORE**, Angus prays that judgment be entered against Defendants as follows:

(a)    **ON THE FIRST CLAIM FOR RELIEF**: For a judicial determination and declaration of the rights, duties, obligations, and relationships of the parties under the IC Agreement, Modification Agreement, and Joint Interest Agreement, and specifically that: (1) the IC Agreement and Modification Agreement: (i) do not create any relationship, rights, duties, or obligations between Angus, BG and Grayson other than those between a principal and independent contractor, respectively; (ii) do not give rise to any rights of BG or Grayson as a joint venturer, partner, general manager, shareholder, owner, director, or officer of Angus, including with respect to the SU Facility;

and (iii) do not constitute, or memorialize any assignment or transfer of the Operating Agreement by Angus to BG and/or Grayson; and (2) the Joint Interest Agreement: (i) does not create any relationship, rights, duties, or obligations between Angus and BG, Grayson Services, and Grayson other than a contractual relationship in which the parties agreed that certain information, documents and communications shared between the parties would be protected by the attorney-client privilege and work product doctrine; and (ii) does not give rise to any rights of BG, Grayson Services, or Grayson as a joint venturer, partner, general manager, shareholder, owner, director, or officer of Angus, including with respect to the SU Facility.

(b)    **ON THE SECOND CLAIM FOR RELIEF**:  For an injunction pursuant to Section 105(a) of the Bankruptcy Code and/or Rule 7065 of the Federal Rules of Bankruptcy Procedure prohibiting BG, Grayson Services, and Grayson, and any others acting in concert with or on any of their behalves, from: (i) representing to any party or entity, including any court, that any of them are partners, joint ventures, general managers, owners, shareholders, directors, officers, assignees, or otherwise hold any interest in Angus or have any authority to represent or control Angus or its affairs; and/or (ii) asserting control or authority over any assets or affairs of Angus to the same extent provided in Section 362 of the Bankruptcy Code;

(c)    **ON THE THIRD CLAIM FOR RELIEF**:  For an extension of the automatic stay under Sections 105(a) and/or 362(a) on a limited basis to bar Defendants and their agents from: (i) taking any action against or on behalf of Angus or the SU Facility that is not contemplated under the IC Agreement, Modification Agreement, or Joint Interest Agreement; and (ii) asserting ownership over, attempting to obtain possession of, or exercising control over Angus and its property, including without limitation the SU Facility; and

Gibson, Dunn &
Crutcher LLP

1         (d)     For such other and further relief as this Bankruptcy Court deems just, equitable, and

2 appropriate under the circumstances.

3 Dated: June 30, 2011

4                                     CRAIG H. MILLET

                                      ROBERT E. PALMER

5                                       KENNETH A. GLOWACKI JR.

                                      LINDA D. LAM

6                                       GIBSON, DUNN & CRUTCHER LLP

7                                     By:    _____

8                                             Craig H. Millet

9                                     Attorneys for Plaintiff

                                    Angus Petroleum Corporation

10 101102592.1

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit A

INDEPENDENT CONTRACTOR AGREEMENT **ORIGINAL**

BETWEEN

B.G. OPERATIONS, LLC

-AND-

ANGUS PETROLEUM CORPORATION

REGARDING

SPRINGFIELD JOINT FACILITY

Independent Contractor Agreement
between BG Operations, LLC and
Angus Petroleum Corporation
Page 2

---

1. **INTRODUCTION**

Angus Petroleum Corporation by an operating agreement dated June 1, 1989 is currently the operator of the Springfield Unit Facility. That original agreement was entered between Angus Petroleum Corporation and Columbia Gas Development Corporation (non-operator). Columbia Gas Development Corporation sold their interest to Hunt Petroleum Corporation (AEC).

Angus Petroleum Corporation was a previously owned subsidiary of The Termo Company. By purchase contract in or about the year 2004 The Termo Company sold all its right, title and interest in the Angus Petroleum Corporation to South Coast Oil Corporation. South Coast Oil Corporation has entered into an operating contract designating Bob Grayson as its agent for all of its Huntington Beach operations, including the Angus Facility.

This contract is between Angus Petroleum Corporation, a wholly owned subsidiary of South Coast Oil Corporation, through its Chief Executive Officer, Don White, and BG Operations, LLC. The purpose of this contract is to set forth the compensation, obligations, rights and duties of the parties as to the independent contractor duties to be performed by BG Operations, LLC on behalf of Angus Petroleum Corporation.

2. **OBLIGATION OF BG OPERTIONS, LLC TO COMPLY WITH OPERATING AGREEMENT**

Attached hereto as Exhibit "1" is the June 1, 1989 Model Form Operating Agreement between Angus Petroleum Corporation and Columbia Development Corporation. Subject to the provisions herein, BG Operations, LLC, through its manager Bob Grayson, agrees to perform all duties and obligations as required under that operating agreement to the extent they are consistent with good oil field practices.

BG Operations, LLC recognizes that there are disputes between Hunt Petroleum Corporation and Angus Petroleum Corporation as to the enforceability of that operating agreement, and that there are disputes between the Department of Oil & Gas and Angus Petroleum Corporation as to the viability of the operations of the Angus Plant. The Department of Oil & Gas has purported to issue an abandonment order on the subject facility and the question of that abandonment order is currently pending on appeal.

Independent Contractor Agreement
between BG Operations, LLC and
Angus Petroleum Corporation
Page 3

---

Subject to the provisions herein, Angus Petroleum Corporation agrees that it will hold BG Operations, LLC and its managers, agents, employees harmless from any and all responsibility or liability that arises from BG Operations, LLC performing the duties under the subject operating agreement.

3.   COMPENSATION OF BG OPERATIONS, LLC

Subject to the below conditions, BG Operations, LLC will be entitled to 25% of the net revenue received from Angus Petroleum Corporation from any production of hydrocarbons or from any sale proceeds from the sale of Angus Petroleum Corporation stock or assets, in part or in full, to any third person.

In exchange for this 25% participation in the net profits received by Angus Petroleum Corporation, BG Operations, LLC agrees to the following:

A.   Once the DOGGR order of abandonment is lifted and/or a Chapter 11 bankruptcy is filed, BG Operations, LLC will advance all expenses required for the operations of the subject facility, including but not limited to payment of employee expenses, pumper expenses, mechanic expenses, parts and materials, regulatory compliance expenses, legal fees and other necessary expenses to the extent that Angus Petroleum Corporation does not have available working capital.

B.   BG Operations, LLC will provide and advance all monies necessary to obtain any equipment, rigs, parts or material necessary to repair and return to production the subject facility.

4.   POSTING OF BOND COVERING THE ANGUS FACILITY

If required for a settlement and/or compliance with DOGGR regulations, BG Operations, LLC and Bob Grayson, as its manager, agree to post the necessary Department of Oil & Gas Bond up to a total of $100,000.00 to comply with the public resource code requirements pertaining to the Angus facility wells.

5.   SECURITY AGREEMENT BETWEEN ANGUS PETROLEUM CORPORATION AND BG OPERATIONS, LLC REGARDING POSTING OF BOND

Angus Petroleum Corporation hereby acknowledges and confirms that it has recorded a Deed of Trust against its fee interest in the subject real property to secure the $100,000.00 bond

Independent Contractor Agreement
between BG Operations, LLC and
Angus Petroleum Corporation
Page 4

being posted by BG Operations, LLC. In the event said $100,000.00 is ultimately distributed to
the Department of Oil & Gas, its stated beneficiary, on behalf of Angus Petroleum Corporations
failure to comply with abandonments orders against it, Angus Petroleum Corporation agrees that
it will pay to Bob Grayson and/or BG Operations, LLC the $100,000.00 principal amount of the
subject bond plus a 7% rate of return until such time as the $100,000.00 has been reimbursed.

6.   **REIMBURSEMENT OF ADVANCES BY BG OPERATIONS, LLC FOR
     OPERATING EXPENSES**

     When and if Angus Petroleum Corporation has sufficient operating capital to cover its
existing liabilities and pay for ordinary operations, it will then reimburse BG Operations LLC
from any other excess funds it receives from the production of hydrocarbons. At such time as
Angus Petroleum Corporation is able to function on its own financial resources, BG Operations,
LLC will have no further obligation to advance any of the above-referenced expenses, wages,
salaries or charges necessary for Angus Petroleum Corporation's operations.

6.   **CONSULTING SERVICES OF BOB GRAYSON ON BEHALF OF ANGUS
     PETROLEUM CORPORATION**

     Bob Grayson, as manager of BG Operations, LLC, also agrees he will bill Angus
Petroleum Corporation a per day rate of $2,000.00 for each 8 hour day expended in supervising,
overseeing and conducting the necessary operations of the subject facility. Said supervisory
consulting services will be passed through pursuant to the Angus Petroleum Corporation
operating agreement to the operating agreement account as further set forth in the Angus
Petroleum Corporation Model Form Operating Agreement, Exhibit "F" - "Accounting Procedure
Joint Operations, " Section 7. It is understood that said independent contractor charges will be
passed through pursuant to the agreement, and credited to Angus Petroleum Corporation.

7.   **INSURANCE**

     BG Operations, LLC agrees it will maintain separate insurance for its operations activity
and name Angus Petroleum Corporation as an additional insured.

8.   **RESPONSIBILITY FOR DAILY OPERATIONS**

     BG Operations, LLC agrees it will maintain sufficient personnel at facility to operate it on
a daily basis, and maintain the equipment facilities in good working condition.

Independent Contractor Agreement
between BG Operations, LLC and
Angus Petroleum Corporation
Page 5

9.    **TERMINATION OF AGREEMENT**

This agreement will continue until such time as the Angus Facility is sold, or until such time as the parties mutually agree to its termination in writing. The obligations of BG Operations, LLC through its manager, Bob Grayson, are not assignable to any other party or person without the written consent of Angus Petroleum Corporation.

10.    **ATTORNEYS' FEES**

In the event that there is litigation that arises to enforce any provisions of this agreement, the prevailing party will be entitled to all attorneys' fees actually expended, including but not limited to all attorneys' fees expended on appeal of any issue adjudicated to final judgment between the parties.

DATE:    May ____, 2007                    ANGUS PETROLEUM COMPANY

By _____
DON WHITE, C.E.O.

DATE:    May ____, 2007                    BG OPERATIONS, LLC

By: _____
BOB GRAYSON
Owner

EXHIBIT "K"

A.A.P.L. FORM 610-1982

# MODEL FORM OPERATING AGREEMENT

OPERATING AGREEMENT

DATED

JUNE 1 , 19 89 ,

OPERATOR _____ ANGUS PETROLEUM CORPORATION _____

CONTRACT AREA _____

_____

_____

COUNTY OR PARISH OF ___ORANGE___ STATE OF __CALIFORNIA__

COPYRIGHT 1982 — ALL RIGHTS RESERVED
AMERICAN ASSOCIATION OF PETROLEUM
LANDMEN, 2404 CONTINENTAL LIFE BUILDING,
FORT WORTH, TEXAS, 76102, APPROVED FORM.
A.A.P.L. NO. 610 · 1982 REVISED

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982 

## OPERATING AGREEMENT

THIS AGREEMENT, entered into by and between __ANGUS PETROLEUM CORPORATION__
hereinafter d
referred to as "Operator", and the signatory party or parties other than Operator, sometimes hereinafter referred to indiv
as "Non-Operators", and collectively as "Non-Operators",

## WITNESSETH:

WHEREAS, the parties to this agreement are owners of oil and gas leases and/or oil and gas interests in the lan
Exhibit "A", and the parties hereto have reached an agreement to explore and develop these leases and/or oil and gas lr
production of oil and gas to the extent and as hereinafter provided,

NOW, THEREFORE, it is agreed as follows:

### ARTICLE I.
### DEFINITIONS

As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

A. The term "oil and gas" shall mean oil, gas, casinghead gas, gas condensate, and all other liquid or gaseous
and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is specifi

B. The terms "oil and gas lease", "lease" and "leasehold" shall mean the oil and gas leases covering
lying within the Contract Area which are owned by the parties to this agreement.

C. The term "oil and gas interests" shall mean unleased fee and mineral interests in tracts of land ly
Contract Area which are owned by parties to this agreement.

D. The term "Contract Area" shall mean all of the lands, oil and gas leasehold interests and oil and gas interests
developed and operated for oil and gas purposes under this agreement. Such lands, oil and gas leasehold interests and oil i
are described in Exhibit "A".

E. The term "drilling unit" shall mean the area fixed for the drilling of one well by order or rule o
federal body having authority. If a drilling unit is not fixed by any such rule or order, a drilling unit shall be the drilling r
ed by the pattern of drilling in the Contract Area or as fixed by express agreement of the Drilling Parties.

F. The term "drillsite" shall mean the oil and gas lease or interest on which a proposed well is to be located.

G. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay its shr
any operation conducted under the provisions of this agreement.

H. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects no
in a proposed operation.

Unless the context otherwise clearly indicates, words used in the singular include the plural, the plur
singular, and the neuter gender includes the masculine and the feminine.

### ARTICLE II.
### EXHIBITS

The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:
☒ A. Exhibit "A", shall include the following information:
    (1) Identification of lands subject to this agreement.
    (2) Restrictions, if any, as to depths, formations, or substances.
    (3) Percentages or fractional interests of parties to this agreement.
    (4) Oil and gas leases and/or oil and gas interests subject to this agreement.
    (5) Addresses of parties for notice purposes.
☒ B. Exhibit "B", Form of Lease.
☒ C. Exhibit "C", Accounting Procedure.
☒ D. Exhibit "D", Insurance.
☒ E. Exhibit "E", Gas Balancing Agreement.
☒ F. Exhibit "F", Non-Discrimination and Certification of Non-Segregated Facilities.
☐ G. Exhibit "G", Tax Partnership.
If any provision of any exhibit, except Exhibits "E" and "G", is inconsistent with any provision contai
of this agreement, the provisions in the body of this agreement shall prevail.

- 1 -

A.A.P.L. FORM 610 - M   1 OPERATING AGREEMENT · 2 

## TABLE OF CONTENTS

Article | Title

I.   DEFINITIONS...............................................................
II.  EXHIBITS.................................................................
III. INTERESTS OF PARTIES.....................................................
     A. OIL AND GAS INTERESTS.................................................
     B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION.........................
     C. EXCESS ROYALTIES, OVERRIDING ROYALTIES AND OTHER PAYMENTS............
     D. SUBSEQUENTLY CREATED INTERESTS.......................................
IV.  TITLES...................................................................
     A. TITLE EXAMINATION....................................................
     B. LOSS OF TITLE........................................................
        1. Failure of Title.................................................
        2. Loss by Non-Payment or Erroneous Payment of Amount Due...........
        3. Other Losses.....................................................
V.   OPERATOR.................................................................
     A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR.........................
     B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR........
        1. Resignation or Removal of Operator...............................
        2. Selection of Successor Operator..................................
     C. EMPLOYEES...........................................................
     D. DRILLING CONTRACTS..................................................
VI.  DRILLING AND DEVELOPMENT................................................
     A. INITIAL WELL........................................................
     B. SUBSEQUENT OPERATIONS...............................................
        1. Proposed Operations..............................................
        2. Operations by Less than All Parties..............................
        3. Stand-By Time....................................................
        4. Sidetracking.....................................................
     C. ACCESS TO CONTRACT AREA AND INFORMATION.............................
     D. ABANDONMENT OF WELLS................................................
        1. Abandonment of Dry Holes.........................................
        2. Abandonment of Wells that have Produced..........................
        3. Abandonment of Non-Consent Operations............................
VII. EXPENDITURES AND LIABILITY OF PARTIES...................................
     A. LIABILITY OF PARTIES................................................
     B. LIENS AND PAYMENT DEFAULTS..........................................
     C. PAYMENTS AND ACCOUNTING.............................................
     D. LIMITATION OF EXPENDITURES..........................................
        1. Drill or Deepen..................................................
        2. Rework or Plug Back..............................................
        3. Other Operations.................................................
     E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES.................
     F. TAXES...............................................................
     G. INSURANCE...........................................................
VIII. ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST.......................
     A. SURRENDER OF LEASES.................................................
     B. RENEWAL OR EXTENSION OF LEASES......................................
     C. ACREAGE OR CASH CONTRIBUTIONS.......................................
     D. MAINTENANCE OF UNIFORM INTEREST.....................................
     E. WAIVER OF RIGHTS TO PARTITION.......................................
     F. PREFERENTIAL RIGHT TO PURCHASE......................................
IX.  INTERNAL REVENUE CODE ELECTION.........................................
X.   CLAIMS AND LAWSUITS.....................................................
XI.  FORCE MAJEURE..........................................................
XII. NOTICES................................................................
XIII. TERM OF AGREEMENT......................................................
XIV. COMPLIANCE WITH LAWS AND REGULATIONS...................................
     A. LAWS, REGULATIONS AND ORDERS........................................
     B. GOVERNING LAW.......................................................
     C. REGULATORY AGENCIES................................................
XV.  OTHER PROVISIONS.......................................................
XVI. MISCELLANEOUS..........................................................

ii

A.A.P.L. FORM 6  . FORM OPERATING AGREEMENT - 1982

## ARTICLE III.
## INTERESTS OF PARTIES

**A. Oil and Gas Interests**

If any party owns an oil and gas interest in the Contract Area, that interest shall be treated for all purposes of this
and during the term hereof as if it were covered by the form of oil and gas lease/mineral interest Exhibit "B", and the o
shall be deemed to own both the royalty interest reserved in such lease and the interest of the lessee thereunder.
**acceptable to such owner providing for a 1/4 royalty.**

**B. Interests of Parties in Costs and Production**

Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall b
paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their in
forth in Exhibit "A". In the same manner, the parties shall also own all production of oil and gas from the Contract Area:
payment of royalty to the owners _____ which shall be borne as herein.
**all existing royalties and other burdens which are not Subs**
**created interests** _____ constituted already roller of oil and gas interest) borne as which royalty
payable, costs and entitled to receive a share of production of oil and gas from the Contract Area shall bear and shall pay
costs to be paid or delivered, to the extent of its interest in such production, **its proportionate share of all burdens**
other parties free from any liability therefor. No party shall ever be responsible, however, on a price basis higher than the
by such party, to any other party's lessor or royalty owner, and if any such other party's lessor or royalty owner shou
receive settlement on a higher price basis, the party contributing the affected lease shall bear the additional royalty burden
such higher price.

Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered h

**C. Excess Royalties, Overriding Royalties and Other Payments**

Unless changed by other provisions, if the interest of any party in any lease covered hereby is subject to
overriding royalty, production payment or other burden on production in excess of the amount stipulated in Article III.B.
burdened shall assume and alone bear all such excess obligations and shall indemnify and hold the other parties hereto harm
and all claims and demands for payment asserted by owners of such excess burden.

**D. Subsequently Created Interests**
**See Article XV. A.**
If any party should hereto create an overriding royalty, production payment or other burden payable out
attributable to its working interest hereunder, or if such a burden existed prior to this agreement and is not set forth in E
was not disclosed in writing to all other parties prior to the execution of this agreement by all parties, or is not a jointly act
accepted obligation of all parties (any such interest being hereinafter referred to as "subsequently created interest" in
tioning of its creation and the party out of whose working interest the subsequently created interest is derived being here
to as "burdened party"), and:

1. If the burdened party is required under this agreement to assign or relinquish to any other party, or parties,
   of its working interest and/or the production attributable thereto, said other party, or parties, shall receive said ar
   production free and clear of said subsequently created interest and the burdened party shall indemnify and save
   or parties, harmless from any and all claims and demands for payment asserted by owners of the subsequently
   and;

2. If the burdened party fails to pay, when due, its share of expenses chargeable hereunder, all provisions of Artic
   enforceable against the subsequently created interest in the same manner as they are enforceable against the w
   the burdened party.

## ARTICLE IV.
## TITLES

**A. Title Examinations**

Title examination shall be made on the drillsite of any proposed well prior to commencement of drilling
the Drilling Parties so request, title examination shall be made on the leases and/or oil and gas interests included, or pla
ed, in the drilling unit around such well. The opinion will include the ownership of the working interest, minerals, r
royalty and production payments under the applicable leases. At the time a well is proposed, each party contributing le
gas interests to the drillsite, or to be included in such drilling unit, shall furnish to Operator all abstracts (including i
reports), title opinions, title papers and curative material in its possession free of charge. All such information not in i
made available to Operator by the parties, but necessary for the examination of the title, shall be obtained by Operat
cause title to be examined by attorneys on its staff or by outside attorneys. Copies of all title opinions shall be furni
hereto. The cost incurred by Operator in this title program shall be borne as follows:

☐ Option No. 1: Costs incurred by Operator in procuring abstracts and title examination (including prelimi
shut-in gas royalty opinions and division order title opinions) shall be a part of the administrative overhead as provid
and shall not be a direct charge, whether performed by Operator's staff attorneys or by outside attorneys.

- 2 -

 

A.A.P.L. FORM 610 · MO___ _ FORM OPERATING AGREEMENT · 1982

## ARTICLE IV
continued

(3) Option No. 2: Costs incurred by Operator in procuring abstracts and fees paid outside attorneys for title s (including preliminary), supplemental, shut-in gas royalty opinions and division order title opinions) shall be borne by the Dri in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties at such interest as hibit "A". Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance functions.

Each party shall be responsible for securing curative matter and pooling amendments or agreements required in with lessor or oil and gas interests contributed by such party. Operator shall be responsible for the preparation and recordin designations or declarations as well as the conduct of hearings before governmental agencies for the securing of spacing or po This shall not prevent any party from appearing on its own behalf at any such hearing.

No well shall be drilled on the Contract Area until after (1) the title to the drillsite or drilling unit has been examin provided, and (2) the title has been approved by the examining attorney or title has been accepted by all of the parties wh ticipate in the drilling of the well.

B. Loss of Titles:

1. Failure of Title: Should any oil and gas interest or lease, or interest therein, be lost through failure of title, which lo reduction of interest from that shown on Exhibit "A", the party contributing the affected lease or interest shall have min from final determination of title failure to acquire a new lease or other instrument curing the entirety of the title failure, w tion will not be subject to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all and gas leases and interests: and,

(a) The party whose oil and gas lease or interest is affected by the title failure shall bear alone the entire loss and it entitled to recover from Operator or the other parties any development or operating costs which it may have theretofore paid but there shall be no additional liability as its part to the other parties hereto by reason of such title failure;

(b) There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the inter been lost, but the interests of the parties shall be revised on an acreage basis, as of the time it is determined finally that title fi curred, so that the interest of the party whose lease or interest is affected by the title failure will thereafter be reduced in Area by the amount of the interest lost;

(c) If the proportionate interest of the other parties hereto in any producing well theretofore drilled on the Con increased by reason of the title failure, the party whose title has failed shall receive the proceeds attributable to the increa terest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connect well;

(d) Should any person not a party to this agreement, who is determined to be the owner of any interest in the ti failed, pay in any manner any part of the cost of operation, development, or equipment, such amounts shall be paid to the p who bore the costs which are so refunded;

(e) Any liability to account to a third party for prior production of oil and gas which arises by reason of title f borne by the party or parties whose title failed in the same proportion in which they shared in such prior production

(f) No charge shall be made to the joint account for legal expenses, fees or salaries, in connection with the defense claimed by any party hereto, it being the intention of the parties hereto that each shall defend title to its interest and bear connection therewith.

2. Loss by Non-Payment or Erroneous Payment of Amount Due: If, through mistake or oversight, any rental payment, minimum royalty or royalty payment, is not paid or is erroneously paid, and as a result a lease or interest ther there shall be no monetary liability against the party who failed to make such payment. Unless the party who failed to ma payment secures a new lease covering the same interest within ninety (90) days from the discovery of the failure to make p which acquisition will not be subject to Article VIII.B., the interests of the parties shall be revised on an acreage basis, eff date of termination of the lease involved, and the party who failed to make proper payment will no longer be credited wi the Contract Area on account of ownership of the lease or interest which has terminated. In the event the party who lo required payment shall not have been fully reimbursed, at the time of the loss, from the proceeds of the sale of oil and ga the lost interest, calculated on an acreage basis, for the development and operating costs theretofore paid on account of shall be reimbursed for unrecovered actual costs theretofore paid by it (but not for its share of the cost of any dry hole p or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:

(a) Proceeds of oil and gas, less operating expenses, theretofore accrued to the credit of the lost interest, on u up to the amount of unrecovered costs;

(b) Proceeds, less operating expenses, thereafter accrued attributable to the lost interest on an acreage basis, of oil and gas thereafter produced and marketed (excluding production from any wells thereafter drilled) which, in the absen termination, would be attributable to the lost interest on an acreage basis, up to the amount of unrecovered costs, the portion of the oil and gas to be contributed by the other parties in proportion to their respective interests; and,

(c) Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the own tion for the privilege of participating in the Contract Area or becoming a party to this agreement.

3. Other Losses: All losses incurred, other than those set forth in Articles IV.B.1. and IV.B.2. above, shall and shall be borne by all parties in proportion to their interests. There shall be no readjustment of interests in the remai the Contract Area.

-3-

A.A.P.L. FORM 610      FORM OPERATING AGREEME.    1982

### ARTICLE V.
### OPERATOR

A. Designation and Responsibilities of Operators

### ANGUS PETROLEUM CORPORATION

Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as pe required by, and within the limits of this agreement. It shall conduct all such operations in a good and workmanlike manner, have no liability as Operator to the other parties for losses sustained or Liabilities incurred, except such as may result negligence or willful misconduct.

B. Resignation or Removal of Operator and Selection of Successors

    1. Resignation or Removal of Operator: Operator may resign at any time by giving written notice thereof to No if Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, or is no longer capable Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a success may be removed if it fails or refuses to carry out its duties hereunder, or becomes insolvent, bankrupt or is placed in receive affirmative vote of two (2) or more Non-Operators owning a majority interest based on ownership as shown on Exhibit "A after excluding the voting interest of Operator. Such resignation or removal shall not become effective until 7:00 o'clock . first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Opera by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator. A chi parties name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corpora be the basis for removal of Operator.

    2. Selection of Successor Operator: Upon the resignation or removal of Operator, a successor Operator shall b the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time o Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a ma based on ownership as shown on Exhibit "A"; provided, however, if an Operator which has been removed fails to vote or succeed itself, the successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was remov

C. Employees:

    The number of employees used by Operator in conducting operations hereunder, their selection, and the hours o compensation for services performed shall be determined by Operator, and all such employees shall be the employees o

D. Drilling Contracts

    All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in t desires. Operator may employ its own tools and equipment in the drilling of wells, but in charges therefor shall not exceed rates in the area and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are c such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in dependent contractors who are doing work of a similar nature.

### ARTICLE VI.
### DRILLING AND DEVELOPMENT

A. Initial Wells:

oil and gas at the following location:

and shall thereafter continue the drilling of the well with due diligence to

unless granite or other practically impenetrable substance or condition in the hole, which renders further drilling

    Operator shall make reasonable tests of all formations encountered during drilling which give indication o gas in quantities sufficient to test, unless this agreement shall be limited in its application to a specific formation or fo event Operator shall be required to test only the formation or formations to which this agreement may apply.

- 4 -

A.A.P.L. FORM — MODEL FORM OPERATING AGREEMENT

ARTICLE VI

continued

If, in Operator's judgment, the well will not produce oil or gas in paying quantities, and it wishes to plug the well as a dry hole, the provisions of Article VI.E.1. shall thereafter apply.

B. Subsequent Operations:

1. Proposed Operations: Should any party hereto desire to drill any well on the Contract Area other than the well for in Article VI.A., or to rework, deepen or plug back a dry hole drilled at the joint expense of all parties or a well theretofore drilled at the joint expense and not then producing in paying quantities, the party desiring to drill, rework, deepen or plug back such other parties written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective formation and the estimated cost of the operation. The parties receiving such a notice shall have thirty (30) days after receipt of the notice within which to notify the party wishing to do the work whether they elect to participate in the cost of the proposed operation, if such operation is on location, notice of a proposal to rework, plug back or drill deeper may be given by telephone and the response thereto limited to forty-eight (48) hours, exclusive of Saturday, Sunday and legal holidays. Failure of a party receiving such a notice to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation. Any response given by telephone shall be promptly confirmed in writing.

If all parties elect to participate in such a proposed operation, Operator shall, within ninety (90) days after expiration of the period of thirty (30) days (or as promptly as possible after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be), actually commence the proposed operation and complete it with due diligence at the risk and expense of the parties hereto provided, however, said commencement date may be extended upon written notice of same by Operator to the other parties for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title examination or curative matter required for title approval or acceptance. Notwithstanding the force majeure provision of this agreement, if actual operation has not commenced within the time provided (including any extension thereof as specifically permitted herein) and if any party hereto still desires to conduct said operation, written notice proposing same must be resubmitted to the other parties in accordance with the provisions hereof as if no prior proposal had been made.

2. Operations by Less than All Parties: If any party receiving such notice as provided in Article VI.B.1. (Option No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, within ninety (90) days after the expiration of the notice period of thirty (30) days (or as promptly as possible after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be) actually commence the proposed operation and complete it with due diligence. Operator shall perform all work for the account of the Consenting Parties provided, however, if no drilling rig or other equipment is on location, and if the Operator is a Non-Consenting Party, the Consenting Parties shall either: (a) request Operator to perform the work required by such operation for the account of the Consenting Parties, or (b) designate one (1) of the Consenting Parties as Operator to perform such work. The party or parties conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and conditions of this agreement.

If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable notice period, shall advise the Consenting Parties of the total interest of the parties approving such operation and its recommendation as to whether the Consenting Parties should proceed with the operation as proposed. Each Consenting Party, within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after receipt of such notice, shall advise the proposing party of its desire to (a) limit participation to such party's interest as shown on Exhibit "A" or (b) carry its proportionate part of Non-Consenting Parties' interests, and failure to advise the proposing party shall be deemed an election under (a). In the event a drilling rig is on location, the time permitted for such a response shall not exceed a total of forty-eight (48) hours (inclusive of Saturday, Sunday and legal holidays). The proposing party, at its election, may withdraw such proposal if there is insufficient participation and shall promptly notify all parties of such decision.

The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have elected to bear same under the terms of the preceding paragraph. Consenting Parties shall keep the leasehold estate and operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties. If such an operation results in a dry hole, the Consenting Parties shall plug and abandon the well and restore the surface location at their sole cost, risk and expense. If any well drilled, reworked, deepened or plugged back under the provisions of this Article results in a producer of oil and/or gas in paying quantities, the Consenting Parties shall complete and equip the well to produce at

-5-



A.A.P.L. FORM      DEL FORM OPERATING AGREEMENT - 1982

## ARTICLE VI
### continued

and the well shall then be turned over to Operator and shall be operated by it at the expense and for the account of the
tles. Upon commencement of operations for the drilling/reworking, deepening or plugging back of any such well by Co
in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Co
and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such
Party's interest in the well and share of production therefrom until the proceeds of the sale of such share, calculate
market value thereof if such share is not sold, (after deducting production taxes, excise taxes, royalty, overriding roy-
ttents not excepted by Article III.D. payable out of or measured by the production from such well accruing with respe
until it reverts) shall equal the total of the following:

____100%____

(a) 100% of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment be
connections (including, but not limited to, stock tanks, separators, treaters, pumping equipment and piping), plus N
Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing un
Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed
Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to such
Party had it participated in the well from the beginning of the operations; and

(b) ____400__% of that portion of the costs and expenses of drilling, reworking, deepening, plugging back, testin
after deducting any cash contributions received under Article VIII.C. and ____400__% of that portion of the cost of new
ment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consen
participated therein.

An election not to participate in the drilling or the deepening of a well shall be deemed an election not to par
working or plugging back operation proposed in such a well, or portion thereof, to which the initial Non-Consent elec
conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment a
reworking or plugging back operation conducted during the recoupment period shall be deemed part of the cost of op
and there shall be added to the sums to be recouped by the Consenting Parties one hundred percent (100%) of that por
the reworking or plugging back operation which would have been chargeable to such Non-Consenting Party had it par
such a reworking or plugging back operation is proposed during such recoupment period, the provisions of this Artic
plicable as between said Consenting Parties in said well.

During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of
proceeds therefrom, Consenting Parties shall be responsible for the payment of all production, severance, excise, g
taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production
ticle III.D.

In the case of any reworking, plugging back or deeper drilling operation, the Consenting Parties shall be pe
of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain u
abandonment of a well after such reworking, plugging back or deeper drilling, the Consenting Parties shall accoun
ment to the owners thereof, with each party receiving its proportionate part in kind or in value, less cost of salv

Within sixty (60) days after the completion of any operation under this Article, the party conducting th
Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connecti
itemized statement of the cost of drilling, deepening, plugging back, testing, completing, and equipping the well for
option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statem
ings. Each month thereafter, during the time the Consenting Parties are being reimbursed as provided above, the
statement for the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all c
curred in the operation of the well, together with a statement of the quantity of oil and gas produced from it and th
realized from the sale of the well's working interest production during the preceding month. In determining the q
produced during any month, Consenting Parties shall use industry accepted methods such as, but not limited to,
well tests. Any amounts realized from the sale or other disposition of equipment newly acquired in connection wit
which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the r
of the work done and of the equipment purchased in determining when the interest of such Non-Consenting Part
above provided; and if there is a credit balance, it shall be paid to such Non-Consenting Party.

(2) Condition D

Material, excluding junk, no longer suitable for its original purpose, but usable for some oth priced on a basis commensurate with its use. Operator may dispose of Condition D Materi normally used by Operator without prior approval of Non-Operators.

    (a) Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seaml parable size and weight. Used casing, tubing or drill pipe utilized as line pipe shall be pipe prices.

    (b) Casing, tubing or drill pipe used as higher pressure service lines than standard line pipe shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset be priced on a non upset basis.

(3) Condition E

Junk shall be priced at prevailing prices. Operator may dispose of Condition E Material u mally utilized by Operator without prior approval of Non-Operators.

D. Obsolete Material

Material which is serviceable and usable for its original function but condition and/or value o equivalent to that which would justify's price as provided above may be specially priced as agr Such price should result in the Joint Account being charged with the value of the service rende

E. Pricing Conditions

(1) Loading or unloading costs may be charged to the Joint Account at the rate of twenty-five ce weight on all tubular goods movements. In lieu of actual loading or unloading costs assu point. The above rate shall be adjusted as of the first day of April each year following Januar percentage increase or decrease used to adjust overhead rates in Section III, Paragraph l rate calculated shall be rounded to the nearest cent and shall be the rate in effect until the f year. Such rate shall be published each year by the Council of Petroleum Accountants Soc

(2) Material involving erection costs shall be charged at applicable percentage of the current k new Material.

3. Premium Prices

Whenever Material is not readily obtainable at published or listed prices because of national emerge unusual causes over which the Operator has no control, the Operator may charge the Joint Acc Material at the Operator's actual cost incurred in providing such Material, in making it suitable f it to the Joint Property. ~~price it however it shall be in the direct~~ Non-Operators for such Material. Each Non-Operator shall have the right ~~upon electing and noti~~ ten days after receiving notice ~~from Operator~~ to furnish in kind all or part of his share of such Ma ~~at a price comparable with Operator~~

4. Warranty of Material Furnished By Operator

Operator does not warrant the Material furnished. In case of defective Material, credit shall not Account until adjustment has been received by Operator from the manufacturers or their agents.

## V. INVENTORIES

The Operator shall maintain detailed records of Controllable Material.

1. Periodic Inventories, Notice and Representation

At reasonable intervals, inventories shall be taken by Operator of the Joint Account Controllable M of intention to take inventory shall be given by Operator at least thirty (30) days before any Inver Non-Operators may be represented when any inventory is taken. Failure of Non-Operators to be r tory shall bind Non-Operators to accept the inventory taken by Operator.

2. Reconciliation and Adjustment of Inventories

Adjustments to the Joint Account resulting from the reconciliation of a physical inventory sh months following the taking of the inventory. Inventory adjustments shall be made by Operator t overages and shortages, but, Operator shall be held accountable only for shortages due to lack o

3. Special Inventories

Special inventories may be taken whenever there is any sale, change of interest or change of Operat it shall be the duty of the party selling to notify all other Parties as quickly as possible after the t place. In such cases, both the seller and the purchaser shall be governed by such inventory. In c of Operator, all Parties shall be governed by such inventory.

4. Expense of Conducting Inventories

A. The expense of conducting periodic inventories shall not be charged to the Joint Account Parties.

B. The expense of conducting special inventories shall be charged to the Parties requesting suc ventories required due to change of Operator shall be charged to the Joint Account.

A.A.P.L. FORM — MODEL FORM OPERATING AGREEMENT - 1

## ARTICLE VI
### continued

1   If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts t
2   the relinquished interest of such Non-Consenting Party shall automatically revert to it, and, from and after such re
3   Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, t
4   theretofore as such Non-Consenting Party would have been entitled to had it participated in the drilling, reworking, dec
5   back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of
6   the operation of said well in accordance with the terms of this agreement and the Accounting Procedure attached.

10   Notwithstanding the provisions of this Article VI.B.2., it is agreed that without the mutual consent of all pa
11   be completed in or produced from a source of supply from which a well located elsewhere on the Contract Area is pre
12   well conforms to the then-existing well spacing pattern for such source of supply.

15   The provisions of this Article shall have no application whatsoever to the drilling of the initial well describ
16   except (a) as to Article VII.D.1. (Option No. 2), if selected, or (b) as to the reworking, deepening and plugging back
17   after it has been drilled to the depth specified in Article VI.A. if it shall thereafter prove to be a dry hole or, if initiall
18   duction, ceases to produce in paying quantities.

23   3. Stand-By Time: When a well which has been drilled or deepened has reached its authorized depth and
24   completed, and the results thereof furnished to the parties, stand-by costs incurred pending response to a party's
25   reworking, deepening, plugging back or completing operation in such a well shall be charged and borne as part of th
26   ing operation just completed. Stand-by costs subsequent to all parties responding, or explosion of the response time t
27   first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms
28   medial paragraph of Article VI.B.2., shall be charged to and borne as part of the proposed operation, but if the pro
29   withdrawn because of insufficient participation, such stand-by costs shall be allocated between the Consenting Part
30   each Consenting Party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" o
31   ties.

35   4. Sidetracking: Except as hereinafter provided, those provisions of this agreement applicable to a "deepe
36   also be applicable to any proposal to directionally control and intentionally deviate a well from vertical so as to d
37   location therein called "sidetracking"), unless done to straighten the hole or to drill around junk in the hol
38   mechanical difficulties. Any party having the right to participate in a proposed sidetracking operation that does not
39   affected well bore to the time of the notice shall, upon electing to participate, tender to the well bore owners its pro
40   to its interest in the sidetracking operation) of the value of that portion of the existing well bore to be utilized

44   (a) If the proposal is for sidetracking an existing dry hole, reimbursement shall be on the basis of the
45   the initial drilling of the well down to the depth at which the sidetracking operation is initiated.

49   (b) If the proposal is for sidetracking a well which has previously produced, reimbursement shall be on
50   salvable materials and equipment down to the depth at which the sidetracking operation is initiated, determined
51   provisions of Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abando

55   In the event that notice for a sidetracking operation is given while the drilling rig to be utilized is on locat
56   shall be limited to forty-eight (48) hours, exclusive of Saturday, Sunday and legal holidays; provided, however, an
57   receive up to eight (8) additional days after expiration of the forty-eight (48) hours within which to respond by pay
58   incurred during such extended response period. If more than one party elects to take such additional time to resp
59   by costs shall be allocated between the parties taking additional time to respond on a day-to-day basis in the prop
60   ty's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing
61   stances the response period to a proposal for sidetracking shall be limited to thirty (30) days.

### C. TAKING PRODUCTION IN KIND:

67   Each party shall take in kind or separately dispose of its proportionate share of all oil and gas produced
68   exclusive of production which may be used in development and producing operations and in preparing an
69   marketing purposes and production unavoidably lost. Any extra expenditure incurred in the taking in kind or s
70   party of its proportionate share of the production shall be borne by such party. Any party taking its share of p

-7-

A.A.P.L. FORM    MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE VI

continued

required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.

Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payments directly from the purchaser for its share of all production.

In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the oil produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not the obligation, to purchase such oil or sell it to others at any time and from time to time, for the account of the non-taking party at the best price obtainable in the area for such production. Any such purchase or sale by Operator shall be subject always to the right of the owner of the production to exercise at any time its right to take in kind, or separately dispose of, its share of all oil not previously delivered to a purchaser. Any purchase or sale by Operator of any other party's share of oil shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one (1) year.

In the event one or more parties' separate disposition of its share of the gas causes split-stream deliveries to separate pipelines and/or deliveries which on a day-to-day basis for any reason are not exactly equal to a party's respective proportionate share of total gas sales to be allocated to it, the balancing or accounting between the respective accounts of the parties shall be in accordance with any gas balancing agreement between the parties hereto, whether such an agreement is attached as Exhibit "E", or is a separate agreement.

D.   Access to Contract Area and Information:

Each party shall have access to the Contract Area at all reasonable times, at its sole cost and risk to inspect or observe operations, and shall have access at reasonable times to information pertaining to the development or operation thereof, including Operator's books and records relating thereto. Operator, upon request, shall furnish each of the other parties with copies of all forms or reports filed with governmental agencies, daily drilling reports, well logs, tank tables, daily gauge and run tickets and reports of stock on hand at the first of each month, and shall make available samples of any cores or cuttings taken from any well drilled on the Contract Area. The cost of gathering and furnishing information to Non-Operator, other than that specified above, shall be charged to the Non-Operator who requests the information.

E.   Abandonment of Wells:

1. Abandonment of Dry Holes: Except for any well drilled or deepened pursuant to Article VI.B.2., any well which has been drilled or deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be plugged and abandoned without the consent of all parties. Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after receipt of notice of the proposed abandonment of such well, such party shall be deemed to have consented to the proposed abandonment. All such wells shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling such well. Any party who objects to plugging and abandoning such well shall have the right to take over the well and conduct further operations in search of oil and/or gas subject to the provisions of Article VI.B.

2. Abandonment of Wells that have Produced: Except for any well in which a Non-Consent operation has been conducted hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has been completed as a producer shall not be plugged and abandoned without the consent of all parties. If all parties consent to such abandonment, the well shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto. If, within thirty (30) days after receipt of notice of the proposed abandonment of any well, all parties do not agree to the abandonment of such well, those wishing to continue its operation from the interval(s) of the formation(s) then open to production shall tender to each of the other parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with Exhibit "C", less the estimated cost of salvaging and the estimated cost of plugging and abandoning. Each abandoning party shall assign to the non-abandoning parties, without warranty, express or implied, as to title or to quantity, or fitness for use of the material, all of its interest in the well and related equipment, together with its interest in the leasehold estate as to that portion of the formation or formations then open to production. If the interest of the abandoning party is or includes an oil and gas interest, such party shall execute and deliver to the non-abandoning party or parties an oil and gas lease, limited to the interval or intervals of the formation or formations then open to production, for a term of one (1) year and so long thereafter as oil and/or gas is produced from the interval or intervals of the formation or formations covered thereby, such lease to be on the form specified in Article III.A

-8-



A.A.P.L. FORM   ODEL FORM OPERATING AGREEMENT - 19

## ARTICLE VI
### continued

"dp". The assignments or leases so limited shall encompass the "drilling unit" upon which the well is located. The pay assignments or leases to, the assignees shall be in a ratio based upon the relationship of their respective percentage of Contract Area to the aggregate of the percentage of participation in the Contract Area of all assignees. There shall be interests in the remaining portion of the Contract Area.

Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or the well in the interval or intervals then open other than the royalties retained in any lease made under the terms of this quest. Operator shall continue to operate the assigned well for the account of the non-abandoning parties in the rate templated by this agreement, plus any additional cost and charges which may arise as the result of the separate owners will. Upon proposed abandonment of the producing interval(s) assigned or leased, the assignor or lessor shall then repurchase its prior interest in the well (using the same valuation formula) and participate in further operations therein visions hereof.

3. Abandonment of Non-Consent Operations: The provisions of Article VI.E.1. or VI.E.L. above shall be apt Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided, howev permanently plugged and abandoned unless and until all parties having the right to conduct further operations therein of the proposed abandonment and afforded the opportunity to elect to take over the well in accordance with the provi VI.E.

## ARTICLE VII.
### EXPENDITURES AND LIABILITY OF PARTIES

### A. Liability of Parties

The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly among the parties in Article VII.B, are given to secure only the debts of each severally. It is not the intention of the p shall this agreement be construed as creating, a mining or other partnership or association, or to render the parti

### B. Liens and Payment Defaults:

Each Non-Operator grants to Operator a lien upon its oil and gas rights in the Contract Area, and a security of oil and/or gas when extracted and its interest in all equipment, to secure payment of its share of expense, together at the rate provided in Exhibit "C". To the extent that Operator has a security interest under the Uniform Com state, Operator shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing taining of judgment by Operator for the secured indebtedness shall not be deemed an election of remedies or oth rights or security interest as security for the payment thereof. In addition, upon default by any Non-Operator in the of expense, Operator shall have the rights, without prejudice to other rights or remedies, to collect from the purchase the site of such Non-Operator's share of oil and/or gas until the amount owed by such Non-Operator, plus interest purchaser shall be entitled to rely upon Operator's written statement concerning the amount of any default. Open and security interest to the Non-Operators to secure payment of Operator's proportionate share of expense.

If any party, fails or is unable to pay its share of expense within sixty (60) days after rendition of a s Operator, the non-defaulting parties, including Operator, shall, upon request by Operator, pay the unpaid amount r the interest of each such party bears to the interest of all such parties. Each party so paying its share of the unpaid a reimbursement thereof, be subrogated to the security rights described in the foregoing paragraph.

### C. Payments and Accountings:

Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurre and operation of the Contract Area pursuant to this agreement and shall charge each of the parties herein with it tionate shares upon the expense basis provided in Exhibit "C". Operator shall keep an accurate record of the jo showing expenses incurred and charges made and received.

Operator, at its election, shall have the right from time to time to demand and receive from the other parti of their respective shares of the estimated amount of the expense to be incurred in operations hereunder durin month, which right may be exercised only by submission to each such party of an itemized statement of such estim with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated exp on or before the 20th day of the next preceding month. Each party shall pay to Operator its proportionate share c fifteen (15) days after such statement and invoice is received. If any party fails to pay its share of said estimate within due shall bear interest as provided in Exhibit "C" until paid. Proper adjustment shall be made monthly between perise to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and n

### D. Limitation of Expenditures:

1. Drill or Deepen: Without the consent of all parties, no well shall be drilled or deepened, except any w pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the drilling or deepening shall inv

A.A.P.L. FOR<sub>…</sub>  'ODEL FORM OPERATING AGREEM. . 19<sub>…</sub>

ARTICLE VII
continued

1 ☐ Option No. 1: All necessary expenditures for the drilling or deepening, testing, completing and equipping of
2 necessary tankage and/or surface facilities.
3
4 ☒ Option No. 2: All necessary expenditures for the drilling and testing of the well. When such e
5 authorized depth, and all tests have been completed, and the results thereof furnished to the parties, Operator shall gi
6 to the Non-Operators who have the right to participate in the completion costs. The parties receiving such notice sl
7 (48) hours (exclusive of Saturday, Sunday and legal holidays) in which to elect to participate in the setting of casing an
8 tempt. Such election, when made, shall include consent to all necessary expenditures for the completing and equippi
9 cluding necessary tankage and/or surface facilities. Failure of any party receiving such notice to reply within the peri
10 constitute an election by that party not to participate in the cost of the completion attempt. If one or more, but less th
11 elect to set pipe and to attempt a completion, the provisions of Article VI.B.2. hereof (the phrase "reworking, dee
12 back" as contained in Article VI.B.2. shall be deemed to include "completing") shall apply to the operations thereof
13 than all parties.
14
15 2. Rework or Plug Back: Without the consent of all parties, no well shall be reworked or plugged back except
16 plugged back pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the reworking or plugging
17 include all necessary expenditures in conducting such operations and completing and equipping of said well, includin
18 and/or surface facilities.
19
20 3. Other Operations: Without the consent of all parties, Operator shall not undertake any single project e
21 to require an expenditure in excess of __Twenty-Five Thousand__ Dollars (1__25__
22 except in connection with a well, the drilling, reworking, deepening, completing, recompleting, or plugging back
23 previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flo
24 emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in his
25 to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the em
26 parties. If Operator prepares an authority for expenditure (AFE) for its own use, Operator shall furnish any Non-Op
27 an information copy thereof for any single project costing in excess of __Twenty-Five Thousand__
28 Dollars (1__25,000.00__) but less than the amount first set forth above in this paragraph.
29
30 E.  Rentals, Shut-in Well Payments and Minimum Royalties:
31
32 Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease
33 party or parties who subjected such lease to this agreement at its or their expense. In the event two or more partie
34 subjected interests in the same lease to this agreement, such parties may designate one of such parties to make said
35 behalf of all such parties. Any party may request, and shall be entitled to receive, proper evidence of all such paym
36 failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or overs
37 ment is required to continue the lease in force, any loss which results from such non-payment shall be borne in acc
38 visions of Article IV.B.2.
39
40 Operator shall notify Non-Operator of the anticipated completion of a shut-in gas well, or the shut-in in or
41 of a producing gas well, at least five (5) days (excluding Saturday, Sunday and legal holidays), or at the earliest oppo
42 circumstances, prior to taking such action, but assumes no liability for failure to do so. In the event of failure by
43 Non-Operator, the loss of any lease contributed hereto by Non-Operator for failure to make timely payment of any
44 shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.
45
46 F.  Taxes
47
48 Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem
49 subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assesse
50 become delinquent. Prior to the rendition date, each Non-Operator shall furnish Operator information as to burden
51 be limited to, royalties, overriding royalties and production payments) on leases and oil and gas interests cont
52 Operator. If the assessed valuation of any leasehold estate is reduced by reason of its being subject to outstanding
53 riding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the b
54 owners of such leasehold estate, and Operator shall adjust the charge to such owner or owners so as to reflect the
55 tion. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest,
56 anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto as to
57 value generated by each party's working interest. Operator shall bill the other parties for their proportionate shares
58 the manner provided in Exhibit "C".
59
60 If Operator considers any tax assessment improper, Operator may, at its discretion, protest within t
61 prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the prote
62 mination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest,
63 interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay t
64 count, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, a
65 provided in Exhibit "C".
66
67 Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed
68 the production or handling of such party's share of oil and/or gas produced under the terms of this agreemen
69
70

A.A.P.L. FOR         IODEL FORM OPERATING AGREEMENT - I

## ARTICLE VII
continued

G. Insurance:

At all times while operations are conducted hereunder, Operator shall comply with the workmen's com the state where the operations are being conducted; provided, however, that Operator may be a self-insurer for liability pensation laws in which event the only charge that shall be made to the joint account shall be as provided in Exhibit "also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D", attached hereof. Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workmen's law of the state where the operations are being conducted and to maintain such other insurance as Operator may

In the event automobile public liability insurance is specified in said Exhibit "D", or subsequently receives parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automobile

## ARTICLE VIII.
### ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST

A. Surrender of Leases

The leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be su or in part unless all parties consent thereto.

However, should any party desire to surrender its interest in any lease or in any portion thereof, and the c agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, such lease, or portion thereof, and any well, material and equipment which may be located thereon and any r thereafter secured, to the parties not consenting to such surrender. If the interest of the assigning party is or includ terest, ~~the provisions of Article III.B. shall apply~~ surrender to all other parties for the consideration noted in said of such oil and gas interest for a term of one (1) year and so long thereafter as oil and/or gas is produced from the land co lease as to be con the form attached hereto as Exhibit "B". Upon such assignment or lease, the assigning party shall obligations thereafter accruing, but not theretofore accrued, with respect to the interest assigned or leased and the o attributable thereto, and the assigning party shall have no further interest in the assigned or leased premises and its diction other than the royalties retained in any lease made under the terms of this Article. The party assignee or le party assignor or lessee the reasonable salvage value of the latter's interest in any wells and equipment attributable to ed acreage. The value of all material shall be determined in accordance with the provisions of Exhibit "C", less t salvaging and the estimated cost of plugging and abandoning. If the assignment or lease is in favor of more than on shall be shared by such parties in the proportions that the interest of each bears to the total interest of all such p

Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, less party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract A assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms of agreement, **but shall be subject to an operating agreement ide agreement changed only to reflect the names and interests owning an interest therein.**
B. Renewal or Extension of Leases

If any party secures a renewal of any oil and gas lease subject to this agreement, all other parties shall be no shall have the right for a period of thirty (30) days following receipt of such notice in which to elect to participate in renewal lease, insofar as such lease affects lands within the Contract Area, by paying to the party who acquired it the portionate shares of the acquisition cost allocated to that part of such lease within the Contract Area, which shall be interests held at that time by the parties in the Contract Area.

If some, but less than all, of the parties elect to participate in the purchase of a renewal lease, it shall be a who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation to the aggregate of the percentages of participation in the Contract Area of all parties participating in the purchase r Any renewal lease in which less than all parties elect to participant shall not be subject to this agreement.

Each party who participates in the purchase of a renewal lease shall be given an assignment of its proportio by the acquiring party.

The provisions of this Article shall apply to renewal leases whether they are for the entire interest covered or cover only a portion of its area or an interest therein. Any renewal lease taken before the expiration of its predece contracted for within six (6) months after the expiration of the existing lease shall be subject to this provision; but a tracted for more than six (6) months after the expiration of an existing lease shall not be deemed a renewal lease and the provisions of this agreement.

The provisions in this Article shall also be applicable to extensions of oil and gas leases.

C. Acreage or Cash Contributions:

While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other o applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the p tribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Par

-11-

A.A.P.L. FORM 610 — MODEL FORM OPERATING AGREEMENT · 1982

## ARTICLE VIII

continued

1  said Drilling Parties shared the cost of drilling the well. Such acreage shall become a separate Contract Area and, to the ex-
2  governed by provisions identical to this agreement. Each party promptly notify all other parties of any acreage or cas
3  it may obtain in support of any well or any other operation on the Contract Area. The above provisions shall also be c
4  tional rights to earn acreage outside the Contract Area which are in support of a well drilled inside the Contract Ar
5
6   If any party contracts for any consideration relating to disposition of such party's share of substances produced f
7  consideration shall not be deemed a contribution as contemplated in this Article VIII.C.
8
9  D.   Maintenance of Uniform Interest:
10
11   For the purpose of maintaining uniformity of ownership in the oil and gas leasehold interests covered by this
12  party shall sell, encumber, transfer or make other disposition of its interest in the leases embraced within the Contract A
13  equipment and production unless such disposition ~~come either~~
14
15   ~~1. the entire interest of the party in all leases and equipment and production; or~~
16
17   ~~2. an equal undivided interest in all leases and equipment and production in the Contract Area~~
18
19   Every such sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to
20  and shall be made without prejudice to the right of the other parties. Any extra expenditure i
21  result of a failure to dispose by the party any additional i
22  transferring the interest of any party is fulfilled, such party shall be made.
23  require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, r
24  and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, ea a
25  party's interest within the scope of the operations embraced in this agreement; however, all such co-owners shall have t
26  into and execute all contracts or agreements for the disposition of their respective shares of the oil and gas produced fr
27  ~~Amended, they shall have the right to receive, separately, payment of the sale proceeds thereof.~~
28
29  E.   Waiver of Rights to Partition:
30
31   If permitted by the laws of the state or states in which the property covered hereby is located, each party h
32  undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in sever
33  interest therein.
34
35   ~~F.   Preferential Right to Purchase:~~
36
37   ~~Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests~~
38  ~~Area, it shall promptly give written notice to the other parties, with full information concerning its proposed sale, which~~
39  ~~name and address of the prospective purchaser (who must be ready, willing and able to purchase), the purchase price, a~~
40  ~~of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after receipt of the n~~
41  ~~on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exerc~~
42  ~~ing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of a~~
43  ~~ties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage i~~
44  ~~dispose of its interest by merger, reorganization, consolidation, or sale of all or substantially all of its assets to a subsidia~~
45  ~~company, or to a subsidiary of a parent company, or to any company in which any one party owns a majority of the st~~
46
47  ## ARTICLE IX.
48  ### INTERNAL REVENUE CODE ELECTION
49
50   This agreement is not intended to create, and shall not be construed to create, a relationship of partnership
51  for profit between or among the parties hereto. Notwithstanding any provision herein that the rights and liabilities her
52  and not joint or collective, or that this agreement and operations hereunder shall not constitute a partnership, if, for
53  purposes, this agreement and the operations hereunder are regarded as a partnership, each party hereby affected ele
54  from the application of all of the provisions of Subchapter "K", Chapter 1, Subtitle "A", of the Internal Revenue Co
55  mitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. Operator is authorized
56  ecute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of th
57  United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the re
58  and the data required by Federal Regulations 1.761. Should there be any requirement that each party hereby aff
59  evidence of this election, each such party shall execute such documents and furnish such other evidence as may t
60  Federal Internal Revenue Service or as may be necessary to evidence this election. No such party shall give any notice
61  action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in v
62  Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter
63  Subtitle "A", of the Internal Revenue Code of 1954, under which an election similar to that provided by Section 761
64  mitted, each party hereby affected shall make such election as may be permitted or required by such laws. In making
65  tion, each such party states that the income derived by such party from operations hereunder can be adequately deter
66  computation of partnership taxable income.
67
68
69
70

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

ARTICLE X.

CLAIMS AND LAWSUITS

Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure does not exceed _____Twenty-Five Thousand and NO/100_____ Dollars ($25,000.00_____ ) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling, settling, or otherwise discharging such claim or suit shall be at the joint expense of the parties participating in the operation from which the claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder.

ARTICLE XI.

FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to make money payments, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspending during, but no longer than, the continuance of the force majeure. The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable.

The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

The term "force majeure", as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

ARTICLE XII.

NOTICES

All notices authorized or required between the parties and required by any of the provisions of this agreement, unless otherwise specifically provided, shall be given in writing by mail or telegram, postage or charges prepaid, or by telex or telecopier and addressed to the parties to whom the notice is given at the addresses listed on Exhibit "A". The originating notice given under any provision hereof shall be deemed given only when received by the party to whom such notice is directed, and the time for such party to give any notice in response thereto shall run from the date the originating notice is received. The second or any responsive notice shall be deemed given when deposited in the mail or with the telegraph company, with postage or charges prepaid, or sent by telex or telecopier. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties.

ARTICLE XIII.

TERM OF AGREEMENT

This agreement shall remain in full force and effect as to the oil and gas leases and/or oil and gas interests subject hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any lease or oil and gas leasehold interest contributed by any other party beyond the term of this agreement.

☐   Option No. 1: So long as any of the oil and gas leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal, or otherwise.

☒   Option No. 2: In the event the well described in Article VI.A., or any subsequent well drilled under any provision of this agreement, results in production of oil and/or gas in paying quantities, this agreement shall continue in force so long as any such well or wells produce, or are capable of production, and for an additional period of _____180 days_____ days from cessation of all production; provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling, reworking, deepening, plugging back, testing or attempting to complete a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein. In the event the well described in Article VI.A., or any subsequent well drilled hereunder, results in a dry hole, and no other well is producing, or capable of producing oil and/or gas from the Contract Area, this agreement shall terminate unless drilling, deepening, plugging back or reworking operations are commenced within _____180 days_____ days from the date of abandonment of said well.

It is agreed, however, that the termination of this agreement shall not relieve any party hereto from any liability which has accrued or attached prior to the date of such termination.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1982

## ARTICLE XIV.
### COMPLIANCE WITH LAWS AND REGULATIONS

A.  Laws, Regulations and Orders

This agreement shall be subject to the conservation laws of the state in which the Contract Area is located, the regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and municipal finances, rules, regulations, and orders.

B.  Governing Laws

This agreement and all matters pertaining hereto, including, but not limited to, matters of performance, non-performance, remedies, procedures, rights, duties and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states, the law of the state of _____ shall govern.

C.  Regulatory Agencies

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any privilege, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or orders under such laws in reference to oil, gas and mineral operations, including the location, operation, or production of wells located or adjacent to the Contract Area.

With respect to operations hereunder, Non-Operators agree to release Operator from any and all losses, damages, and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation or application of rulings, regulations or orders of the Department of Energy or predecessor or successor agencies to the extent such interpretation was made in good faith. Each Non-Operator further agrees to reimburse Operator for any amounts applied to Operator's share of production that Operator may be required to refund, rebate or pay as a result of such an incorrect application, together with interest and penalties thereon owing by Operator as a result of such incorrect interpretation.

Non-Operators authorize Operator to prepare and submit such documents as may be required to be submitted in respect of any crude oil sold hereunder or to any other person or entity pursuant to the requirements of the "Crude Oil Windfall of 1980", as same may be amended from time to time ("Act"), and any valid regulations or rules which may be issued by the Department from time to time pursuant to said Act. Each party hereto agrees to furnish any and all certifications or other information which is required to be furnished by said Act in a timely manner and in sufficient detail to permit compliance with said Act.

## ARTICLE XV.
### OTHER PROVISIONS

A.  <u>Subsequently Created Interest.</u>  Notwithstanding the provisions of this agreement to the contrary, if any party hereto shall subsequent to the effective date of this agreement create an overriding royalty, production payment, net proceeds interest, or other interest or if such an interest was created prior to the effective date of this agreement but was neither recorded in the county/parish in which the Contract Area is located nor disclosed in writing to all parties hereto at the time of execution hereof (any such interest shall hereafter be referred to as a "Subsequently Created Interest"), such Subsequently Created Interest shall be specifically subject to all of the terms and provisions of this Agreement, as follows:

.(1)    If non-consent operations are conducted pursuant to any provision of this agreement, and the party conducting such operations becomes entitled to the production attributable to the interest out of which the Subsequently Created Interest is derived, such party shall receive same free and clear of such Subsequently Created Interest.  The party creating same shall bear and pay such Subsequently Created Interests and shall indemnify and hold the owner of the interest hereto free and harmless from any and all liability resulting therefrom.

(2)    If the owner of the interest for which a Subsequently Created Interest is derived fails to pay, when due, its share of expenses chargeable hereunder, the lien granted the other parties hereto under the provisions of Article VII.B. or the appropriate state statutes shall cover and affect the Subsequently Created Interest and the rights of the parties shall be the same as if the Subsequently Created Interest had not been created.

-14-

(3)    If the owner of the interest from which a Subsequently Created
derived (i) elects to abandon a well under the provisions of Article VI.
(ii) elects to surrender a lease (or portion thereof) under the provisions
VIII.A. hereof, (iii) elects not to pay rentals attributable to its interest in
and thereby is required to assign the lease or that portion or interest t
which it elects not to pay rentals to those parties paying such rental, or
not to participate in an Obligatory Operation as defined in Article :
assignment resulting from such election shall be free and clear of the Su
Created Interest.

(4)    The owner creating such interest shall indemnify and hold the oil
hereto harmless from any claim or cause of action by the own
Subsequently Created Interest.

B.    Multiple Proposals.  It is specifically provided that no notice shall be g
Article VI hereof which proposes the drilling of more than one well.  Fi
provisions of Article VI, insofar as same pertains to notification by a party of
to drill a well, shall be suspended for so long as (1) a prior notice has been g
is still in force and effect and the period of time during which the well regar
may be commenced has not expired, or (2) a well is then being drilled hereun
paragraph shall not apply under those circumstances where the well to whic
directed is a well which is required under the terms of a lease or contract or on
to maintain a lease or portion thereof in force.

C.    Obligatory Operations.    Notwithstanding  the  other  provisions  h
particularly Article VI, if the proposed operation is an Obligatory Operation, i
participating in such operation shall assign to the parties participating in the op
of its interest in the leases, or portion thereof, and to the formations and dept
thereby which would be lost or not earned if such operation is not conduc
assignment shall be due upon the commencement of operations for such well a
free and clear of any (i) mortgages, liens or other similar encumbrances plac
by the non-consenting party or resulting from the non-consenting party's own
operations subsequent to the date of this Agreement and (ii) Subsequent
Interests, but otherwise without warranty of title, either express or implied.
other operation commenced within six (6) months prior to the date the leas
(or portions thereof) would expire in the absence of such operation and a we
operation which must be drilled or conducted to "earn" or maintain a lease
rights, shall constitute an "Obligatory Operation".  The provisions of Article
however, continue to apply to any remaining portion of the Contract A
contributes to production from the non-consenting operations (i.e., within
drilling, production or proration unit).  The leasehold interests assigned to the
parties by the non-consenting parties shall no longer be subject to this
Agreement but shall be subject to an operating agreement identical to this
changed only to reflect the names and interests of the consenting parties.

D.    Conflicting Elections.    Notwithstanding anything herein to the co
following provisions of this paragraph shall take precedence over any other
which may be in conflict therewith.  It is agreed that when a well drilled unde
of this Agreement by all parties, or by one or more, but less than all, pa
Article VI shall have been drilled to the contract depth and the parties part
the well cannot mutually agree upon the sequence and timing of further
regarding said well, the following election shall control in the order c
hereinafter.

(1)    An election to attempt to complete the well at either the objecti
objection formation;

(2)    An election to plug back and attempt to complete said well;

(3)    An election to deepen said well; and

(4)    An election to sidetrack the well.

Notwithstanding anything provided in this Article, any party desiring to perform
logging, coring or other testing (other than logging, coring and testing that
performed by a prudent operator before attempting a completion) may do so
cost, risk and expense. In such event, the party or parties undertaking such
testing shall be responsible for any damage to the hole or reservoir resulting
testing. The parties not participating in such additional testing shall not be entitl
logs and other data resulting from such tests.

D.    Advance Payment. If a proposal is made pursuant hereto for th
sidetracking, deepening, completing or recompleting of any well where the estim
exceed $25,000, any Party electing to participate in the proposed operation shal
days after request by Operator (or 72 hours, exclusive of Saturday, Sunday
holidays after such request if a rig capable of performing such operations is c
at the time of such request) either (1) advance its portion of the estimated co
operation, or (2) furnish Operator a letter of credit from a Bank acceptable to
containing terms reasonably acceptable to Operator obligating the Bank to
Party's portion of the estimated costs of such operation, or (3) make ot
arrangements satisfactory to Operator for the payment of its portion of the
costs of such operation. Notwithstanding anything to the contrary contain
agreement, the failure of a Party either to advance its share of such costs, fu
letter of credit, or to make other satisfactory credit arrangements within the tim
shall, at the option of Operator, constitute a withdrawal by the Party of its pri
to participate in the proposed operation and an election by such Party to beco
Consenting Party with respect to such operation. The provisions of this Art
shall be in addition to and not in lieu of other provisions of the Operating A
and particularly Article VII.B. and C. The rights and obligations as betweer
and other Parties Non-Operators hereto who participate in the proposed ope
not be affected for reason of Operator's failure to require any other part
advance payment, furnish a letter of credit, or make other credit arrangemen

A.A.P.L. FORM 610   DEL FORM OPERATING AGREEMENT - 1982

**ARTICLE XVI.**
**MISCELLANEOUS**

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective legal representatives, successors and assigns.

This instrument may be executed in any number of counterparts, each of which shall be considered an original i

IN WITNESS WHEREOF, this agreement shall be effective as of ___1st___ day of ___June___

**OPERATOR**

ANGUS PETROLEUM CORPOI

_____          _____

**NON-OPERATORS**

COLUMBIA GAS DEVELOPMI

_____          _____


_____          _____

- 13 -

## EXHIBIT E

Agreement for sale of Lots 6 and 7, Block 10218, City of Huntington Beach, Orange County, California, from ANGUS Petroleum Corporation to James Righeimer, Righeimer Group, as set forth in the Escrow Instructions to Surety Escrow Services, Inc., dated September 15, 1989.

Unrecorded Oil Sales Contract No. 155104, by and between ANGUS Petroleum Corporation, as Seller, and Chevron U.S.A., Inc., as Buyer, dated January 5, 1988.

Unrecorded Oil Sales Contract by and between Sol Kopel, an individual, as Seller, Chevron U.S.A., Inc., as Buyer, dated August 1, 1969.

00179

EXHIBIT F

Concerned Citizens of Huntington Beach, et al.
vs. City of Huntington Beach, City Council of
Huntington Beach, and ANGUS Petroleum Corporation
(Cause No. 57-76-91), Superior Court,
State of California for Orange County, California)

00180

EXHIBIT G

Recording Requested By:

Columbia Gas Development Corporation
P.O. Box 1350
5847 San Felipe
Houston, Texas  77231-1350

When Recorded Return To:

Columbia Gas Development Corporation
P.O. Box 1350
5847 San Felipe
Houston, Texas  77231-1350 .

CONVEYANCE

ANGUS PETROLEUM CORPORATION (herein called "Grantor"), fc
Ten Dollars and other good and valuable consideration (the
receipt and sufficiency of which is hereby acknowledged), does
hereby GRANT, BARGAIN, SELL, CONVEY, ASSIGN, TRANSFER, SET OVI
and DELIVER unto COLUMBIA GAS DEVELOPMENT CORPORATION (herein
called "Grantee"), whose address is P.O. Box 1350, Houston, Te
77231-1350, an undivided one half (1/2) interest in the follow
described properties, rights and interests:

(a)  All rights, titles and interests of Grantor in
to the oil, gas and/or other mineral leases, and other
interests in oil, gas and/or other minerals (including,
without limitation, Tanner royalties and other royalties)
which are described in Exhibit "A" attached hereto (all o
which are located in the City of Huntington Beach, Orange
County, California);

(b)  All rights, titles and interests of Grantor in
and to the lands which are described on Exhibit "B" attac
hereto (all of which are located in the City of Huntingtc
Beach, Orange County, California);

(c)  Without limitation of the foregoing, all other
rights, titles and interests (including, without limitati
reversionary interests) of Grantor in and to oil, gas and
other minerals (including, without limitation, interests
oil, gas and/or mineral leases, mineral interests and Tan
royalties and other royalties) in and under, and that may
produced from, depths below a depth of 500 feet below the
surface underlying the lands included in the Unit Area
provided for in the Springfield Unit Agreement (below
defined);

(d)  All rights, titles and interests of Grantor in
to, and all rights of Grantor under, that certain Unit
Agreement for the Springfield Unit dated as of March 31,
1987, recorded under file number 87-173292, Official Reco
of Orange County, California, as amended by Amendment dat
as of January 1, 1989, recorded under file number 89-0485
Official Records of Orange County, California (the
"Springfield Unit Agreement"); SAVE AND EXCEPT the right
Grantor to act as (and all rights appurtenant to Grantor'
status as) operator under the Springfield Unit Agreement;

(e)  All rights, titles and interest of Grantor in a
to all wells and related equipment (including, without
limitation, well equipment, casing, tubing, tanks, gather
lines, flowlines, separators, buildings, pumps, compresso
motors, fixtures, machinery and other equipment, and othe
improvements) located on and used in connection with the
operation of the properties described int he clauses (a)
through (d) above, and all rights, titles and interests o
Grantor in and to (i) all easements, surface leases, righ
of-way, servitudes, licenses and other similar estates wh

00181

relate to the properties described in clauses (a) through
(d) above or any of the wells located thereon, (ii) all
rights in, to and under all production sales contracts
(including, without limitation, any of same which might
provide for advance payments), production processing
agreements, operating agreements, pooling, unitization or
comunitization agreements and/or orders and all other
contracts or agreements (including, without limitation,
rights under policies of title insurance and rights under
that certain Agreement for Purchase and Sale of Mineral
Interest between Grantor and Huntington Beach Company, da
June 20, 1988) relating to the properties described in
clauses (a) through (d) above or the production, storage,
treatment, processing, sale or disposal of oil, gas or ot
hydrocarbons, other minerals, water and other substances
therefrom, and, (iii) all rights under presently existing
farmouts, acreage contribution agreements, dry hole
contribution agreements, and other contract and agreement
which relate to the operation of the properties described
clause (a) through (d) above or by which such properties
be earned or acquired.

TO HAVE AND TO HOLD the above described interest unto
Grantee, its successors and assigns, forever.

Grantor warrants and agrees to defend title to the above
described rights, titles and interests unto Grantee, its
successors and assigns, from and against all claims and demand
of persons claiming by, through or under Grantor, but not
otherwise (without limitation, it is agreed that the interest
conveyed to Grantee herein is subject to its proportionate par
of the conveyances, and other matters, described on Exhibit "C"
and that claims arising under the conveyances, and other matte
described on Exhibit "C" shall not constitute breaches of such
warranty).  Except as provided above in this paragraph, this
Conveyance is made without warranties or representations of an
kind; specifically in this connection, but without limiting th
generality of the foregoing, ALL EQUIPMENT, OTHER PERSONAL
PROPERTY AND FIXTURES SOLD AND CONVEYED TO GRANTEE HEREIN ARE
SOLD AND CONVEYED ON AN "AS IS" AND "WHERE IS" BASIS AND GRANT
MAKES NO REPRESENTATIONS OR WARRANTIES, EITHER EXPRESS OR
IMPLIED, AS TO THE MERCHANTABILITY, QUALITY, CONDITION, OR
FITNESS FOR A PARTICULAR PURPOSE OF SUCH EQUIPMENT, OTHER
PERSONAL PROPERTY, AND/OR FIXTURES.  THE PARTIES AGREE THAT, T
THE EXTENT REQUIRED BY LAW TO BE APPLICABLE, THE DISCLAIMERS
CONTAINED WITHIN PARAGRAPH ARE "CONSPICUOUS" DISCLAIMERS FOR T
PURPOSE OF ANY LAW, RULE OR ORDER.  This Conveyance is made wi
full substitution and subrogation of Grantee in and to all
representations and warranties of title heretofore given or ma
by others with respect to the above described interest.

IN WITNESS WHEREOF this Conveyance has been executed and
delivered on October 31, 1989, effective as of 7:00 a.m. Pacif
Daylight Time on June 1, 1989.

ATTEST:                          ANGUS PETROLEUM CORPORATION

_____          By: _____
                                     W.R. Granberry,
                                     Vice President

W:\04038\923691\99090366                    -2-                    00182

STATE OF TEXAS          §
                        §
COUNTY OF DALLAS        §

    On this 31st day of October, 1989, before me, a Notary
Public in and for the State of Texas, personally appeared W.R
GRANBERRY, known to me to be the VICE PRESIDENT of ANGUS
PETROLEUM CORPORATION, which corporation executed the foregoing
instrument, and acknowledged to me that such corporation executed
the same.

                            Notary Public in and for
                            the State of Texas

My commission expires:

-3-

00183

# Exhibit B

## MODIFICATION AGREEMENT

### RECITALS

A.  On or about May 1, 2007, Don White identified as the CEO of Angus Petroleum

Company ("Angus") and Bob Grayson identified as Owner of BG Operations ("BG")

executed a document entitled Independent Contractor Agreement ("the Agreement").

A true copy thereof is attached hereto as Exhibit "1" and incorporated herein

by reference.

B.  The Agreement provides in part, that once the order of abandonment obtained by the

State of California Division of Oil, Gas and Geothermal Resources ("DOGGER")

respecting the Springfield Unit Facility is lifted or Angus becomes a debtor-in-possession

in a Chapter 11 case, BG will advance all monies required to return the Springfield Unit

Facility ("the Facility") to production to the extent Angus is unable to do so.

C.  In consideration of the undertakings set forth in Recital B above, BG is to be reimbursed

its advances from what remains after Angus pays its liabilities and normal operating

expenses and BG is to receive 25% of the net profit received from the sale of

hydrocarbons by Angus or from the sale of Angus' assets or its stock to a third party.

D.  Angus is currently engaged in various matters concerning XTO Offshore, Inc. which had

owned an interest in the Facility and with Elysium West, LLC and E&B Natural

Resources Management Corporation as purchaser and indemnitor of XTO Offshore

respecting the Facility ("the Matters").

E.      Thus far, BG has claimed to have advanced not less than $625,000.00 under paragraph 3A of the Agreement, an amount far in excess of that contemplated when the Agreement was executed, but is unwilling to voluntarily make additional advances without certain modifications and clarifications to the Agreement and ratification by the sole shareholder of Angus, James J. Joseph, in his capacity as Trustee of the estate of South Coast Oil Corporation in Case No. 08:07-12994-TA pending in the United States Bankruptcy Court, Central District of California ("SCOC case").

F.      Angus is at a critical juncture in the Matters and with operation of the Facility and requires additional funds to pay ongoing professional fees and other expenses to ensure that personnel are available to work toward the successful outcome of the Matters for Angus; and to pay expenses to preserve the Facility, including unpaid real property taxes. Without additional funding, the prospects for successful outcomes dim considerably.

## EXECUTORY PROVISIONS

1.      BG has advanced additional funds to Angus, or at its direction, in accordance with the Agreement, to pay proper and legitimate expenses, including professional fees, to assist Angus in attempting to obtain a favorable outcome of the Matters and to protect and preserve the Facility, including funding a payment plan for unpaid real property taxes.

2.      Upon approval by the Trustee, Angus agrees that the advances mentioned in Recital E above and advances made prior to the Facility returning to production on June ____, 2009 (the "Production Date") shall bear interest at the rate of 10% per annum simple interest, without compounding, from the date made and that the same shall not be deemed not owing even though made at a time when a DOGGER order of abandonment was in effect

and at a time when Angus was not a debtor in possession in a Chapter 11 case.
Reimbursement of advances made prior to the Production Date shall be repaid in
accordance with paragraph 6 of the Agreement, unless otherwise set forth herein.

3.   Should Angus obtain money or other tangible assets from XTO, its successors or from
DOGGER (other than regulatory permits or approvals) then BG shall be entitled to
repayment of the advances referenced in paragraph 2 above upon Angus' receipt of such
monies or liquidation by Angus of non-monetary assets so obtained, subject to payment
of prior changes or liens created by agreement or state law in favor of Angus' attorneys
and further subject to the condition that there shall be no payment or liquidation of any
non-monetary assets recovered if the same would have a material adverse effect upon
Angus' operations or business affairs.

4.   From and after the Production Date, BG shall continue to advance all expenses required
for the operations of the Facility, including but not limited to payment of employee
expenses, pumper expenses, mechanic expenses, parts and materials, regulatory
compliance expenses, legal fees and other necessary expenses to the extent that Angus
Petroleum Corporation does not have available working capital.

5.   Should BG acquire an interest in the Facility from a third party (the "Acquisition
Interest") then notwithstanding anything to the contrary in the Agreement, or herein,
Angus and BG shall take such actions and execute such agreements so that Angus shall
own no less than a 50% interest in the Facility and the petroleum producing assets of the
Facility, including extant and future mineral leases, and the provisions of Recital C above

granting BG 25% of the net profit received from the sale of hydrocarbons by Angus or from the sale of Angus' assets or its stock to a third party shall be inoperable.

6. If paragraph 5 becomes operable, BG agrees it will convey the Acquisition Interest to a purchaser and at a price of Angus' choosing or to Angus, if the Purchaser desires only to purchase the stock of Angus, in which event, BG shall be entitled to that percentage the proceeds of such sale that corresponds with the Acquisition Interest, with any monies owing under paragraph 2 hereof to be repaid from proceeds of sale.

7. Any repayment by Angus of funds advanced under this agreement shall only be for those expenses and services, including professional fees, that are reasonable, necessary and legitimate considering the nature, extent and value of such services and expenses to Angus.

8. If an action or actions (which may include a cross-complaint) are initiated in the future by Angus against XTO, its successors, and/or DOGGER with respect to matters relating to the Facility, then Angus shall use its best efforts to agree with the Law Officers of Douglas Mahaffey that said Firm represent Angus on a mutually acceptable contingency fee basis in such future actions.

9. If and only if the provisions of paragraph 5 and 6 herein do not become operative, the 25% interest in proceeds of sale which BG is entitled to obtain under RECITAL C of the Agreement upon sale of the stock of Angus or its assets shall not be applied to such portion of the proceeds received which is equal to the Fair Market Value of the real estate interests included in the sale, said value to be determined as of May 1, 2007, as though the Facility were not to be used to produce hydrocarbons and therefore subject to the

reasonable cost of remediation with credit toward such costs of the value of equipment
and fixtures (the "Real Estate Interest"). As an illustration, if the total value were $14
million and the reasonable cost of remediation was $3 million and the salvage value of
the equipment and fixtures was $500,000.00, then the value of the Real Estate Interest
would be $10.5 million.

10. Calculation of Fair Market Value. For purposes of this Agreement, the "**Fair Market**
**Value**" of the Real Estate Interest will be determined as follows: the parties (or their
successors, heirs, or representatives) will negotiate in good faith for five (5) business days
(the "Negotiation Period") to reach consensus on the fair market value of the Real Estate
Interest, subject to approval by the Bankruptcy Court. If the parties are unable to agree on
a price within this five (5) business day period, then each party to this agreement will
appoint one appraiser within twenty (20) days following the end of the Negotiation
Period. The two appraisers will then each determine the fair market value of the Real
Estate Interest. The appraisers must submit their written appraisals to both parties within
Thirty (30) days after their appointment. Each party must pay for the services of the
appraiser selected by it, plus one half of the fee charged by the third appraiser, if
applicable, as described below. The "**Fair Market Value**" will be determined as follows
(vis-à-vis the appraisers), and will be binding on all of the parties and not subject to
appeal:

A. If one party fails to timely appoint an appraiser or one party's appraiser
fails to timely submit his or her valuation in writing, then the valuation of the
single appraiser timely appointed and timely submitting a valuation in writing will
be deemed the "**Fair Market Value**" of the Real Estate Interest.

B.    If both parties timely appoint an appraiser and the appraisers timely submit their valuations in writing, and the difference between the valuations of the appraisers is ten percent (10%) or less, then the average of the two valuations will be deemed the "**Fair Market Value.**"

C.    If both parties timely appoint an appraiser and the appraisers timely submit their valuations in writing, and the difference between the valuations of the appraisers is more than ten percent (10%), then the two appraisers must, within a period of ten (10) business days after submitting their written valuations, agree on and appoint a third appraiser. The third appraiser must, within thirty (30) days after his or her appointment, determine the fair market value of the Real Estate Interest and submit his or her valuation report in writing to all the parties. The parties will use the average of the two appraisals that have the least difference in value (discarding the third) as the "**Fair Market Value.**"

11.    The stock of Angus is wholly owned by the South Coast Oil Corporation bankruptcy estate and Angus and BG therefore agree that the Bankruptcy Court in the SCOC case shall have sole and exclusive jurisdiction to determine any dispute under the Agreement or this modification.

12.    The effectiveness of this modification is conditional upon its approval by the Bankruptcy Court in the SCOC case.

13.    Except as modified hereby, the terms of the Agreement remain in force and effect.

DATED: ___8-16-09___          By: _____

Don White,
President of Angus Petroleum Corporation


DATED: __7-07-09__          BG OPERATIONS, LLC

By: _____

BOB GRAYSON,
Owner

# Exhibit C

CONFIDENTIAL -- DO NOT DISCLOSE

### JOINT INTEREST AGREEMENT

This Joint Interest Agreement ("JIA"), dated December 22, 2010 sets forth and confirms the agreement among the signatories hereto regarding exchange of information and documents and joint communications and discussions in defense of the Order for Removal, Mitigation or Prevention of a Substantial Threat of Oil Discharge No. OPA 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-0001 ("the Order for Removal" or "the EPA Claim"). This JIA is by and between Angus Petroleum Corporation ("Angus") and BG Operations, LLC; Grason Services, Inc. and Bob Grayson (collectively"BG") (Angus and BG are individually the "Party" and collectively the "Parties").

WHEREAS, on May 1, 2007, BG entered into an agreement with Angus to operate the facility in Huntington Beach.

WHEREAS, on January 2010, the USEPA issued the Order for Removal under the Federal Clean Water Act and under that order Angus is alleged to be liable as the owner the on-shore facility located at 1809 Deleware Street, Huntington Beach, California ("the Facility")[1] where the spill occurred and that Angus may be liable as a responsible party for the resulting removal costs and damages.

WHEREAS, in the EPA Claim, Angus Petroleum is referred to as the "Respondent," but the document makes clear that it "applies and is binding on Respondent, Respondent's directors, officers, employees, agents, trustees, successors, parent company, subsidiaries and assigns."[2]

WHREAS, MAHAFFEY & ASSOCIATES, A Professional Corporation, 4 San Joaquin Plaza, Suite 320, Newport Beach, California 92660 and Douglas Mahaffey (collectively "Mahaffey") had and has been representing both BG and Angus, including defending the EPA claim.

WHEREAS, on March 2, 2010, the EPA Claim was tendered to The Travelers-St. Paul ("Travelers") on behalf of Angus and BG.

WHEREAS, Hunsucker Goodstein & Nelson PC ("HGN") was hired by Angus to be independent counsel and coverage counsel on or about July 22, 2010.

WHEREAS, on August 25, 2010, Travelers responded to the demand with a coverage position, agreeing to defend Angus under a reservation of rights.

WHEREAS, Travelers has not agreed to provide coverage to Angus for cleanup of the oil spill and Travelers takes the position in its reservation of rights letter that Angus is not entitled to coverage for any "Pollution Clean-up Costs."



---

See EPA Claim at 3, 4 and 11. In fact, Angus does own the Facility.
[2] EPA Claim, ¶ 2 at 1-2.

CONFIDENTIAL – DO NOT DISCLOSE

WHEREAS, BG and Angus agree that the intention when the policy was purchased was that Angus have coverage for "Pollution Clean-up Costs."

WHEREAS, on November 10, 2010, the United States Coast Guard sent Angus a letter ("the Coast Guard Letter") which claims that as Angus is liable under the Federal Clean Water Act as part of the EPA Claim.[3]

WHEREAS, the Coast Guard Letter lists amounts incurred to respond to the spill in the amount of $1,567,481.74.

WHEREAS, Angus tendered the Coast Guard Letter to Travelers on November 22, 2010.

WHEREAS, Angus and BG believe that Angus and BG should continue to be defended by Mahaffey in the matters in which Mahaffey currently represents Angus and/or BG, including but not limited to defense of the EPA Claim and related matters and proceedings.

WHEREAS, The Parties have exchanged, and plan in the future to exchange, oral and written information for purposes of the defense of the EPA Claim ("JIA Information," as defined below).

THEREFORE, the Parties agree as set forth below:

1.    Angus and BG agree that they have a joint interest in, *inter alia*, working together to minimize or eliminate exposure from the EPA Claim. Angus and BG also agree that they have a joint interest in ensuring that Travelers does its duty under the policy and defends and indemnifies both Angus and BG from the EPA Claim.

2.    As used in this JIA, "JIA Information" means the past and continued sharing of certain documents, information, factual materials, mental impressions, memoranda, communications with clients and other information, whether oral or written, that would otherwise be subject to the attorney-client, attorney work product, or the joint defense privilege doctrines. For purposes of this JIA, JIA Information shall expressly include all historical, operational or technical documents, information, factual material, or other information generated by each Party that is not otherwise privileged.

3.    When JIA Information is shared among the Parties, the Parties shall treat as privileged and confidential the fact that any such information was shared under this JIA. Disclosure of JIA Information shall be limited to the Parties, their counsel, employees and agents of counsel, and consultants and experts subject to the further provisions of this JIA.



---

[3] FPN number E10903 is the same federal claim number for the EPA Claim and the USCG letter. See FPA Claim, ¶ 13 at 5; USCG letter dated April 1, 2010 at 1; and, USCG letter dated November 15, 2010 at 1.

CONFIDENTIAL - DO NOT DISCLOSE

4.    All disclosures of JIA Information among the Parties shall not constitute a waiver of any privilege from disclosure, including, but not limited to, the attorney-client privilege and the attorney work product privilege.

5.    Execution of this JIA constitutes the Parties' mutual agreement that any consultations among the Parties or their attorneys, and any sharing of JIA Information, including, but not limited to, pooling of work product or other confidential information, are reasonably necessary for the accomplishment of the purpose for which attorneys for the Parties have been consulted and retained. Any consultations among the Parties and their counsel, and any sharing or pooling of work product or other JIA Information, are in reliance on the joint interest privilege.[4]

6.    The execution of this JIA is the Parties' agreement that the contents of all JIA Information that is attorney-client privileged information and/or attorney work product shall be maintained in strictest confidence and used only for purposes of defending against the EPA Claim and related matters.

7.    The Parties agree that this JIA will not be used as evidence in any hearing, action and proceeding against any and all of the Parties, except for interpretation of the JIA itself or when necessary to prevent disclosure of JIA Information.

8.    Nothing in this JIA shall be construed to affect the separate and independent representation of the Parties by respective counsel. Each attorney and/or law firm signing this JIA only represents clients as noted and does not, by virtue hereof, represent all, or any, other signatories or their clients. Nothing herein alters Parties' independent responsibility for legal fees and expenses in the EPA Claim.

9.    Nothing herein shall limit or restrict any Party's rights, if any, to assert any claims against any other Party.

10.    Angus and BG agree that Mahaffey may continue to represent Angus and BG in all matters in which Mahaffey currently represents Angus and/or BG, including but not limited to defense of the EPA Claim and each agree to waive any conflict of interest that exist or may arise related to Mahaffey's continued representation of Angus and/or BG in connection with any of the matters for which Mahaffey represents Angus and/or BG, including but not limited to the EPA Claim.

11.    Each Party to this JIA waives any claim it might have for disqualification of counsel for the other Parties based on access to any JIA Information.



[4] Waller v. Financial Corp. of America, 828 F.2d 579, 583 n. 7 (9th Cir. 1987) ("the joint defense privilege, which is an extension of the attorney client privilege, has been long recognized by this circuit"); Raytheon v. Superior Court, 208 Cal.App.3d 683, 687-88 (1989) ("[A] disclosure in confidence of a privileged communication is not a waiver of the privilege when such disclosure is reasonably necessary for the accomplishment of the purpose for which the lawyer . . . was consulted. . . ." quoting Evidence Code section 912(d)); Insurance Co. of North America v. Superior Court, 108 Cal.App.3d 758, 771 (1980); California Evidence Code Sections 912(d), 952.

CONFIDENTIAL – DO NOT DISCLOSE

12.    Any Party may withdraw from this agreement on written notice to all of the undersigned counsel. Any such withdrawal will be solely on a prospective basis, and any JIA Information exchanged prior to such withdrawal shall continue to be governed by the terms of this JIA.

13.    The Parties agree that this JIA may be executed in counterparts and that facsimile or electronic versions and signatures have the same force and effect as an original.

**(SIGNATURES FOLLOW ON THE NEXT PAGE)**



4 of 6

CONFIDENTIAL – DO NOT DISCLOSE

Bob Grayson

_____

Bob Grayson


MAHAFFEY & ASSOCIATES, APC

By: _____
Douglas L. Mahaffey
Counsel for Grayson Services, Inc.,
BG Operations, LLC and Bob Grayson

6 of 6



CONFIDENTIAL – DO NOT DISCLOSE

AGREED TO AND ACCEPTED:

COPY

Angus Petroleum Corporation

By:_____

Title:_____


MAHAFFEY & ASSOCIATES, APC


By:_____
      Douglas L. Mahaffey
      General Counsel and *Cumis* Counsel
      for Angus Petroleum Corporation


HUNSUCKER GOODSTEIN & NELSON PC



By:_____
      Philip C. Hunsucker
      Independent Counsel and Coverage Counsel
      for Angus Petroleum Corporation



Grayson Services, Inc.

By:_____

Title:_____



BG Operations, LLC

By:_____

Title:_____


(SIGATURES CONTINUE ON NEXT PAGE)

CONFIDENTIAL – DO NOT DISCLOSE

## AGREED TO AND ACCEPTED:

Angus Petroleum Corporation

By: _____

Title: DIRECTOR                    12-28-10


### MAHAFFEY & ASSOCIATES, APC

By: _____
       Douglas L. Mahaffey
       General Counsel and *Cumis* Counsel
       for Angus Petroleum Corporation


### HUNSUCKER GOODSTEIN & NELSON PC

By: _____ [1]
       Philip C. Hunsucker
       Independent Counsel and Coverage Counsel
       for Angus Petroleum Corporation


Grayson Services, Inc.

By: _____

Title: _____


BG Operations, LLC

By: _____

Title: _____

## (SIGATURES CONTINUE ON NEXT PAGE)

5 of 6

CONFIDENTIAL – DO NOT DISCLOSE

AGREED TO AND ACCEPTED:

Angus Petroleum Corporation

By:_____

Title:_____


MAHAFFEY & ASSOCIATES, APC

By:_____
    Douglas L. Mahaffey
    General Counsel and *Cumis* Counsel
    for Angus Petroleum Corporation


HUNSUCKER GOODSTEIN & NELSON PC


By:_____
    Philip C. Hunsucker
    Independent Counsel and Coverage Counsel
    for Angus Petroleum Corporation


Grayson Services, Inc.

By:_____

Title:_____


BG Operations, LLC

By:_____

Title:_____

(SIGATURES CONTINUE ON NEXT PAGE)

**CONFIDENTIAL – DO NOT DISCLOSE**

Bob Grayson
_____
Bob Grayson


**MAHAFFEY & ASSOCIATES, APC**


By:_____
　　Douglas L. Mahaffey
　　Counsel for Grayson Services, Inc.,
　　BG Operations, LLC and Bob Grayson

6 of 6



# Exhibit D

COPY

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF ORANGE - CENTRAL JUSTICE CENTER

DEPARTMENT CX-104

BG OPERATIONS, LLC,                      )
                                         )
              PLAINTIFF,                 )
                                         )
         VS.                             )          CASE NO.
                                         )       30-2009-00122075
XTO OFFSHORE, INC., (FORMERLY            )
KNOWN AS HUNT PETROLEUM (AEC),           )
INC, A DELAWARE CORPORATION);            )
ELYSIUM WEST, LLC, A NEW YORK            )
LIMITED LIABILITY COMPANY; E&B           )
NATURAL RESOURCES MANAGEMENT             )
CORPORATION, A CALIFORNIA                )
CORPORATION, BLACKSTONE OIL & GAS,       )
INC., A PURPORTED CALIFORNIA             )
CORPORATION, DOE JOINT VENTURE,          )
                                         )
              DEFENDANT.                 )
_____)

HONORABLE KIM G. DUNNING, JUDGE PRESIDING

REPORTER'S TRANSCRIPT

MAY 31, 2011

APPEARANCES OF COUNSEL:

  (CONTINUED ON NEXT PAGE.)

LISA S. ROULY, CRR, RPR, CSR NO. 9524
OFFICIAL COURT REPORTER

APPEARANCES OF COUNSEL:

```
    FOR PLAINTIFF:        MAHAFFEY AND ASSOCIATES
                          BY:  DOUGLAS MAHAFFEY, ESQ.

    FOR XTO, ELYSIUM:     BROWN, WHITE & NEWHOUSE
                          BY:  GEORGE B. NEWHOUSE, ESQ.

    FOR ANGUS:            GIBSON, DUNN & CRUTCHER
                          BY:  ROBERT E. PALMER, ESQ.

                          CLINTON BAILEY, ATTORNEYS
                          BY:  MARK BAILEY, ESQ.
                           (SPECIALLY APPEARING)

    FOR JAMES JOSEPH:     RUS, MILIBAND & SMITH
                          BY:  RONALD RUS, ESQ.
```

1          SANTA ANA, CALIFORNIA - TUESDAY, MAY 31, 2011

2                      AFTERNOON SESSION

3                    *  *  *  *  *  *  *  *  *

4      (THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT:)

5          MR. MAHAFFEY:  DOUGLAS MAHAFFEY ON BEARING OF ANGUS

6   PETROLEUM AND B&G.

7          MR. NEWHOUSE:  GEORGE NEWHOUSE CITY AMERICA ON

8   BEHALF OF XTO OFFSHORE, INC., AND ELYSIUM AND E&B AND

9   VARIOUS OTHER ENTITIES.

10          MR. BAILEY:  GOOD AFTERNOON, YOUR HONOR.

11              MARK BAILEY SPECIALLY APPEARING FOR BG

12   OPERATIONS AND BOB GRAYSON.

13          MR. MAHAFFEY:  AND I GUESS I SHOULD CLARIFY.  MY

14   REPRESENTATION ALSO IS OF THE BG OPERATIONS, ANGUS JOINT

15   VENTURE.  SO I'VE BEEN REPRESENTING ALL THREE ENTITIES.

16          THE COURT:  BG OPERATIONS IS NO LONGER A PARTY,

17   RIGHT?  BG IS DONE.  BG IS NOT CURRENTLY A PARTY, SO WE'LL

18   GET THAT SQUARED AWAY.

19          MR. RUS:  GOOD AFTERNOON, YOUR HONOR.

20              RONALD RUS, RUS, MILIBAND & SMITH.  I

21   REPRESENT JAMES JOSEPH, THE TRUSTEE OF SOUTH COAST OIL

22   CORPORATION, WHICH IS THE DEBTOR ENTITY THAT OWNS THE STOCK

23   OF ANGUS.  MR. JOSEPH IS ALSO PRESENT IN THE COURTROOM.  SO

24   WE ARE HERE IN THE EVENT THE COURT HAS ANY QUESTIONS.

25          THE COURT:  GREAT, THANK YOU.

26          MR. RUS:  OTHERWISE, I WON'T BE AT COUNSEL TABLE.

1          MR. PALMER:  GOOD AFTERNOON, YOUR HONOR.

2              ROBERT PALMER OF GIBSON, DUNN & CRUTCHER,

3  CURRENTLY REPRESENTING NO ONE, BUT AT THE REQUEST OF ANGUS

4  PETROLEUM VIA THEIR DULY ELECTED BOARD OF DIRECTORS AND

5  OFFICERS, SEEKING TO BE -- PROBABLY AGAINST MY BETTER

6  JUDGMENT AT THIS POINT -- COUNSEL FOR ANGUS PETROLEUM.

7          THE COURT:  OKAY.  I TAKE IT THAT NO AGREEMENTS

8  WERE REACHED AFTER YOU WERE HERE ON THURSDAY.

9          MR. PALMER:  YOU ARE CORRECT.

10         MR. MAHAFFEY:  THERE WAS NOT ANY MEANINGFUL

11  DISCUSSION.  MY REQUEST HAS BEEN, I THINK, THE TRUSTEE HAS A

12  UNIQUE --

13         THE COURT:  THERE IS NO AGREEMENT CURRENTLY, RIGHT?

14         MR. MAHAFFEY:  CORRECT.

15         THE COURT:  ALL RIGHT.  LET ME ASK A FEW QUESTIONS

16  OR START OFF WITH, WE'RE ALL ON THE SAME PAGE:  BG

17  OPERATIONS IS NO LONGER A HE PARTY, CORRECT, MR. BAILEY?

18         MR. BAILEY:  PARTY TO THIS LITIGATION?

19         THE COURT:  YES.

20         MR. BAILEY:  THAT'S MY UNDERSTANDING.

21         THE COURT:  OKAY.  SO WHAT WE'RE TALKING ABOUT IS

22  MR. MAHAFEY'S REPRESENTATION OF ANGUS PETROLEUM IN THIS

23  LITIGATION, THAT'S WHAT WE'RE TALKING ABOUT.

24         MR. MAHAFFEY:  I DON'T MEAN TO QUIBBLE, AND I

25  ABSOLUTELY UNDERSTAND WHAT THE COURT JUST SAID.  I THINK

26  IT'S IMPERATIVE THAT, AT LEAST FOR THE SAKE OF THIS RECORD,

1   BG OPERATIONS AND ANGUS FORMED A PARTNERSHIP --

2           THE COURT:  OKAY, MR. MAHAFFEY, IS IT YOUR POSITION

3   THAT BG OPERATIONS IS A PARTY TO THIS CURRENT LITIGATION IN

4   THIS COURT, YES OR NO?

5           MR. MAHAFFEY:  NO.

6           THE COURT:  ALL RIGHT.  NOW, I RECEIVED -- I'VE

7   LOOKED AT THE PAPERWORK THAT WAS FILED FOR THURSDAY'S

8   HEARING.  I KEEP RECEIVING THINGS SOMEWHAT HOURLY,

9   INCLUDING, WHAT'S THIS?  THERE'S AN EMERGENCY HEARING IN THE

10  BANKRUPTCY COURT.

11          MR. BAILEY:  YES, YOUR HONOR.

12          THE COURT:  WHEN'S THAT?

13          MR. BAILEY:  THE WAY THE BANKRUPTCY COURT DOES IT

14  IS IT'S FILED AND THEY WILL DETERMINE IT EITHER IT ON THE

15  PAPERS OR IF THERE'S A HEARING TO BE HAD, THEY'LL NOTIFY THE

16  PARTIES.

17          MR. PALMER:  WE HAVE NOT BEEN SERVED WITH AND KNOW

18  NOTHING ABOUT THAT.

19          MR. NEWHOUSE:  AND LIKEWISE, YOUR HONOR, WE

20  REPRESENT THE RESPONDENTS IN THE BANKRUPTCY COURT.  WE'VE

21  HEARD NOTHING ABOUT THAT NOR RECEIVED TELEPHONIC NOTICE.

22          THE COURT:  WERE THE PARTIES IN THE COURTROOM

23  SERVED WITH THIS, MR. BAILEY?

24          MR. BAILEY:  MR. RUS WAS SERVED WITH IT.  AS OF

25  RIGHT NOW I'M ONLY REQUIRED TO SERVE HIM AS THE CHAPTER 11

26  TRUSTEE.  EVERYBODY ELSE WILL BE GETTING THEIR PAPERS LATER

LISA S. ROULY, CRR, RPR, CSR NO. 9524

1   THIS AFTERNOON.

2           THE COURT:  OKAY.

3           MR. BAILEY:  AND I'M NOT REQUIRED UNDER THE FEDERAL

4   RULES OF --

5           THE COURT:  I DIDN'T ASK IF YOU WERE REQUIRED, I

6   JUST ASKED IF ANYBODY ELSE WAS SERVED.

7           MR. BAILEY:  I'M SORRY.

8           THE COURT:  NO, THAT'S OKAY.  I'M JUST TRYING TO

9   GET -- THIS IS A MOST UNUSUAL SITUATION.  SO I'M -- BEAR

10  WITH ME AS I ASK SOME QUESTIONS, I'M JUST LOOKING FOR SOME

11  ANSWERS TO QUESTIONS, I DO NOT HAVE A HIDDEN AGENDA, I JUST

12  NEED AN ANSWER.

13          SOME OF THE MORE RECENT PAPERWORK, AND LET ME

14  DIRECT THIS TO YOU, MR. MAHAFFEY, YOU SUGGEST IN THE

15  PAPERWORK THAT YOU FILED ON THURSDAY THAT MR. GRAYSON -- IS

16  MR. GRAYSON IN THE COURTROOM TODAY?

17          MR. MAHAFFEY:  YES, MA'AM.

18          THE COURT:  WHO IS MR. GRAYSON?

19          OKAY.  GOOD AFTERNOON, SIR.

20          THAT MR. GRAYSON IS THE ONLY ONE WHO CAN MAKE

21  A DECISION ABOUT REPRESENTATION FOR ANGUS PETROLEUM, THAT'S

22  YOUR POSITION?

23          MR. MAHAFFEY:  THAT SUMMARIZES IT SOMEWHAT

24  DIFFERENTLY THAN I'VE ARTICULATED IT.  I DON'T WANT TO

25  QUIBBLE WITH THE COURT, AND I FRANKLY AM NOT COMFORTABLE

26  SPEAKING UNLESS YOU ASK ME TO RESPOND IN MORE DETAIL.

1　　　　　　THE COURT:  I BELIEVE IT'S MR. GRAYSON'S

2　DECLARATION, HE SUGGESTS THAT HE'S THE ONLY ONE WHO HAS

3　AUTHORITY TO SETTLE ON BEHALF OF ANGUS.  YET WHEN WE HAD A

4　MANDATORY SETTLEMENT CONFERENCE A COUPLE WEEKS AGO

5　MR. GRAYSON WASN'T HERE, MR. ZYLSTRA WAS.  SO CAN YOU

6　EXPLAIN THAT DISCREPANCY?

7　　　　　　MR. MAHAFFEY:  I CAN.  I PUT THAT ON THE RECORD

8　THAT THAT MORNING WHEN THE M.S.C. APPEARED ON THE COURT'S

9　TENTATIVE RULING, BOTH MYSELF, AND, I BELIEVE --

10　　　　　　THE COURT:  I'M SORRY, I DON'T THINK I HAD A

11　TENTATIVE RULING FOR AN M.S.C.

12　　　　　　MR. MAHAFFEY:  IT REFERENCED THE M.S.C.  AND I WAS

13　NOT AWARE OF IT THAT MORNING, NEITHER DO I BELIEVE MY

14　OPPOSING COUNSEL WAS.  WE BOTH -- AT LEAST I CONTACTED MY

15　CLIENT TO FIND OUT WHERE MR. GRAYSON WAS, AND THEN PLACED ON

16　THE RECORD THAT I EFFECTED -- THAT I THOUGHT THE EFFECTIVE

17　REAL PARTY IN INTEREST WAS THE TRUSTEE, MR. GRAYSON AND I

18　DISCUSSED IN COURT'S CHAMBERS THE FACT THAT MR. GRAYSON WAS

19　THE REAL PARTY IN INTEREST, IT WAS HIS MONEY AT STAKE.

20　　　　　　THE COURT:  THERE WAS A DIFFERENCE BETWEEN SOMEONE

21　WHO MAY HAVE WRITTEN CHECKS AND WHO HAS CONTROL OF A

22　BUSINESS ENTITY IN TERMS OF THIS LITIGATION.

23　　　　　　　NOW, AS I INDICATED MR. JOSEPH'S --

24　　　　　　MR. RUS:  MR. JOSEPH, YOUR HONOR.

25　　　　　　THE COURT:  GOOD AFTERNOON.

26　　　　　　　-- MR. JOSEPH'S DECLARATION THAT AT SOME

1   POINT IN 2009, AS TRUSTEE FOR ANGUS, HE INSTALLED MR. SCOTT

2   AND MR. ZYLSTRA IN CONTROL OF ANGUS.

3           IS THAT YOUR UNDERSTANDING, MR. BAILEY?

4           MR. BAILEY:  YES, YOUR HONOR.

5           THE COURT:  OKAY.  WHERE IS MR. RUS?  WHAT HAPPENED

6   TO MR. RUS?

7           MR. RUS:  I'M HERE, YOUR HONOR.

8           THE COURT:  IS THAT YOUR UNDERSTANDING AS WELL,

9   MR. RUS?

10          MR. RUS:  YES, IT IS, YOUR HONOR.

11          MR. MAHAFFEY:  THAT'S DIFFERENT THAN MINE.

12          THE COURT:  OKAY.  SO.

13          MR. MAHAFFEY:  I THINK THE FACTS DON'T SUPPORT

14  THAT, YOUR HONOR.  AND I THINK THAT THERE'S A -- LOOK,

15  THERE'S A BIG --

16          THE COURT:  EXCUSE ME, MR. MAHAFFEY.

17          SO YOUR POSITION IS MR. GRAYSON IS IN CHARGE

18  OF ANGUS.

19          MR. MAHAFFEY:  MY POSITION, AS ARTICULATED, YOUR

20  HONOR, WITH ALL RESPECT TO THESE WARRING FACTIONS, IN 2007,

21  WHICH OIL COMPANIES DO ALL THE TIME, YOUR HONOR, THIS IS NOT

22  UNUSUAL.  ANGUS HAD AN OPERATION STATUS --

23          THE COURT:  IN 2007.

24          MR. MAHAFFEY:  -- AND TODAY UNDER VARIOUS

25  INSTRUMENTS THAT IT IS RESPONSIBLE TO FULFILL.  THOSE ARE

26  EITHER THE OIL AND GAS LEASES THAT DEFINED IT AS THE

1    OPERATOR, THAT'S THE LEASEHOLD ESTATE OR THE JOINT OPERATING

2    AGREEMENT.

3              THE MAIN POINT OF THIS ENTIRE ISSUE -- IT'S A

4    FACT QUESTION -- IS WHETHER OR NOT ANGUS DELEGATED IN ITS

5    ENTIRETY THROUGH ITS 2007 CONTRACT, WHICH SAYS THE WORDS,

6    "ALL RESPONSIBILITIES ARE DELEGATED," CONTINUE TO HONOR THAT

7    DELEGATION IN INDUCING MR. GRAYSON TO FUND MONIES, RATIFIED

8    THAT DELEGATION AND NOW CAN COME TO A SUPERIOR COURT AND DO

9    A --

10             THE COURT:  WHO'S COMING TO THE SUPERIOR COURT?

11             MR. MAHAFFEY:  THEY ARE COMING --

12             THE COURT:  WHO IS "THEY"?

13             MR. MAHAFFEY:  GIBSON, DUNN, THROUGH ANGUS

14   PETROLEUM, IS COMING TO THIS SUPERIOR COURT ON AN EX-PARTE

15   APPLICATION SUGGESTING THAT EITHER ONE OR TWO LEGAL

16   CONCLUSIONS EXIST.

17             THE COURT:  MR. MAHAFFEY, LET ME STOP YOU RIGHT

18   THERE, OKAY?

19             SO IN 2007, A NUMBER OF AGREEMENTS WERE IN

20   PLACE THAT PUT MR. GRAYSON IN CHARGE OF THIS LITIGATION ON

21   BEHALF OF ANGUS.

22             MR. MAHAFFEY:  JUST ONE.

23             THE COURT:  ALL RIGHT.  ONE AGREEMENT WAS IN PLACE

24   THAT PUT MR. GRAYSON IN CHARGE OF ANGUS PETROLEUM FOR THE

25   PURPOSE OF THIS LITIGATION, THAT'S YOUR POSITION, YES?

26             MR. MAHAFFEY:  INCLUDING THIS LITIGATION.  IT'S ALL

```
 1    OPERATIONAL MATTERS DEFINED.  YOU EITHER HAVE A ONE --
 2              THE COURT:  MR. MAHAFFEY.
 3         MR. MAHAFFEY:  THAT'S THE POSITION.
 4              THE COURT:  MR. MAHAFFEY, PLEASE.  THERE'S NO
 5    REASON TO KIND OF RAISE YOUR VOICE.  I'M TRYING TO
 6    UNDERSTAND -- THIS IS A MOST UNUSUAL SITUATION.
 7         MR. MAHAFFEY:  I UNDERSTAND.
 8              THE COURT:  SO WE'RE GOING TO TAKE IT A QUESTION AT
 9    A TIME, IF YOU DON'T MIND.
10         MR. MAHAFFEY:  VERY GOOD.
11              THE COURT:  OKAY?  I'M CONCERNED ABOUT WHO HAS THE
12    ABILITY TO CHOOSE THE ATTORNEY FOR ANGUS PETROLEUM TODAY,
13    ALL RIGHT?
14                   NOW, IT'S YOUR POSITION THAT IN 2007
15    MR. GRAYSON HAD THE ABILITY TO DETERMINE WHO WOULD REPRESENT
16    ANGUS PETROLEUM IN THE LITIGATION BEFORE THIS COURT BECAUSE
17    THERE'S LITIGATION OTHER PLACES, AND I'M NOT CONCERNED ABOUT
18    THAT.
19                   SO THAT'S YOUR POSITION, YES?
20         MR. MAHAFFEY:  PARTIALLY, YOUR HONOR.  I APOLOGIZE
21    FOR NOT BEING ABLE TO SAY YES OR NO.  '07 THIS LITIGATION
22    DIDN'T EXIST.  IN '09 --
23              THE COURT:  I'M SORRY, YOU TOLD ME THE AGREEMENT
24    WAS IN 2007.
25         MR. MAHAFFEY:  IT WAS IN 2007.  IT WAS A BLANKET
26    DELEGATION IN ITS ENTIRETY INCLUDING ALL LITIGATION IN THE
```

1  FUTURE AND PRESENT.

2       THE COURT:  MR. MAHAFFEY, WE'RE GOING TO TAKE IT

3  ONE QUESTION AT A TIME, OKAY?

4       MR. MAHAFFEY:  OKAY.

5       THE COURT:  IN 2007 THERE WAS AN AGREEMENT.

6       MR. MAHAFFEY:  CORRECT.

7       THE COURT:  AND IT GAVE MR. GRAYSON CONTROL OVER --

8  I DON'T CARE WHAT ELSE IT GAVE HIM CONTROL OVER.  I'M ONLY

9  CONCERNED WITH THE ABILITY TO DESIGNATE AN ATTORNEY FOR

10 ANGUS PETROLEUM FOR ANY LITIGATION THAT CURRENTLY EXISTED OR

11 LITIGATION THAT MAY BE FILED IN THE FUTURE; IS THAT YOUR

12 POSITION?

13      MR. MAHAFFEY:  YES.

14      THE COURT:  OKAY.  NOW, MR. JOSEPH, AS THE TRUSTEE

15 IN THE BANKRUPTCY COURT, HAS INDICATED THAT THERE WAS A

16 CHANGE IN 2009.  HE'S FILED A DECLARATION TO THAT EFFECT.

17 AND I THINK -- WHO FILED THE DECLARATION -- WHO SUBMITTED

18 MR. DERAVAN'S (PHONETIC) DECLARATION?

19           WAS THAT YOU, MR. RUS?

20      MR. PALMER:  WE DID, YOUR HONOR.

21      THE COURT:  OH, MR. PALMER, OKAY.

22           SO DO YOU AGREE THERE WAS A CHANGE IN THE

23 CIRCUMSTANCES IN 2009?  YOU'RE SHAKING YOUR HEAD; IS THAT A

24 NO?

25      MR. MAHAFFEY:  I DO NOT.  I CAN EXPLAIN.

26      THE COURT:  IS THAT A NO?

1       MR. MAHAFFEY:  THAT'S A NO.

2       THE COURT:  OKAY.  TELL ME WHY YOU DISAGREE.

3       MR. MAHAFFEY:  IN THE 2007 AGREEMENT, I POINTED

4  THIS OUT IN PARAGRAPH 3 AND 8.

5       THE COURT:  YOU POINTED OUT TO WHOM?

6       MR. MAHAFFEY:  TO YOU.  SO -- THESE ARE A LOT OF

7  COMPLICATED FACTS, BUT THESE ARE THE FACTS.

8          IN THE '07 AGREEMENT ANGUS DELEGATED IN ITS

9  ENTIRETY ITS RIGHTS TO RESPONSIBLE OPERATIONS TO BOB

10  GRAYSON, BG, BG OPERATIONS, IN ITS ENTIRETY.

11          AND THEN OBLIGATED HIM TO FULFILL ALL THOSE

12  DUTIES THAT ANGUS WOULD HAVE OTHERWISE FULFILLED HAD IT NOT

13  DELEGATED THEM.

14          IN 2009, THE TRUSTEE THROUGH NEGOTIATIONS

15  WITH MR. GRAYSON ULTIMATELY APPROVED BY AN ANGUS C.E.O.,

16  ENHANCED THE DEFINITION OF WHAT THE MATTERS WERE THAT

17  MR. GRAYSON WAS INDUCED TO FUND AND HANDLE, DEFINED THEM IN

18  PARAGRAPH 7 AS INCLUDING THIS LITIGATION.  AND THEN

19  SPECIFICALLY INCLUDED THAT THERE WOULD LIKELY BE A

20  CROSS-COMPLAINT ANGUS WOULD FILE.

21          MR. GRAYSON EXCHANGED FURTHER CONSIDERATIONS.

22  IT WAS CALLED A MODIFICATION, BECAUSE IT RATIFIED THE '07

23  AGREEMENT, IT THEN ENHANCED IT WITH DEFINING IN THIS

24  DOCUMENT, THE '09 AGREEMENT, THIS LAWSUIT.

25          MR. GRAYSON COMMENCED THIS LAWSUIT AND

26  CONTINUED UNINTERRUPTED --

1          THE COURT:  EXCUSE ME, PLEASE.  WE NEED TO BE

2    REALLY ACCURATE HERE WITH OUR TERMINOLOGY.  MR. GRAYSON IS

3    NOT A PARTY.  ANGUS IS A PARTY.

4          MR. MAHAFFEY:  YOUR HONOR, I APOLOGIZE, I SAID HE

5    COMMENCED IT.  THIS WAS --

6          THE COURT:  NO, HE DID NOT BECAUSE HE'S NOT A

7    PARTY.

8          MR. MAHAFFEY:  HE COMMENCED IT.  LET ME SEE IF I

9    CAN REPHRASE IT.  HE INITIATED THE LAWSUIT AS THE ONLY

10   PLAINTIFF, IT WAS CALLED BG OPERATIONS VERSUS XTO.

11         THE COURT:  MR. MAHAFFEY, MR. GRAYSON DID NOT

12   INITIATE ANYTHING ON HIS OWN BEHALF AS AN INDIVIDUAL, DID

13   HE?

14         MR. MAHAFFEY:  WELL, YES, HE DID.

15         THE COURT:  IS IT BG OPERATIONS, OR IS IT

16   MR. GRAYSON?  WHO'S THE PARTY?

17         MR. MAHAFFEY:  BG OPERATIONS LLC THROUGH ITS

18   MANAGER, BOB GRAYSON.

19         THE COURT:  ALL RIGHT.  BG OPERATIONS WAS THE PARTY

20   INITIALLY.  BG OPERATIONS IS NO LONGER A PARTY IN THIS

21   ACTION, RIGHT?

22         MR. MAHAFFEY:  THEY WERE DISMISSED IN FEBRUARY OF

23   THIS YEAR AS A DEFENDANT.

24         THE COURT:  ANGUS PETROLEUM IS A PARTY.

25         MR. MAHAFFEY:  THAT'S TRUE.

26         THE COURT:  NOW, IS IT YOUR POSITION THAT

1   MR. JOSEPH IS IN ERROR WHEN HE STATES IN HIS DECLARATION

2   UNDER PENALTY OF PERJURY THAT MR. ZYLSTRA HAS CONTROL OF

3   ANGUS TODAY?

4           MR. MAHAFFEY:  HOW DO YOU ANSWER A YES OR NO

5   QUESTION REGARDING AN ERROR?  I DON'T THINK MR. JOSEPH WOULD

6   STAND UP HERE THROUGH HIS COUNSEL AND SUGGEST THAT BOB

7   GRAYSON THROUGH BG OPERATIONS 2007 AND 2009 MODIFIED

8   AGREEMENT ARE TERMINATED.

9           I ASKED MR. PALMER TO SOLVE TODAY'S HEARING

10  BY PUTTING ON GIBSON DUNN'S LETTERHEAD TO MR. BAILEY THAT

11  THAT CONTRACT IS TERMINATED.  I INVITED MR. JOSEPH, IF THAT

12  WAS HIS POSITION.

13          I WAS TOLD JUST THE OPPOSITE BY MR. ZYLSTRA

14  AND MR. PALMER.  THOSE CONTRACTS --

15          THE COURT:  YOU WERE TOLD WHAT?

16          MR. MAHAFFEY:  THOSE CONTRACTS HAVE NOT BEEN

17  TERMINATED.

18          THE COURT:  ALL RIGHT.  THANK YOU.  LET ME STOP YOU

19  RIGHT THERE.

20          MR. BAILEY, DO YOU HAVE A POSITION ON THESE

21  CONTRACTS?

22          MR. BAILEY:  I BELIEVE THAT THEY'RE ENFORCE AND

23  EFFECT.

24          THE COURT:  SO YOU AGREE MR. MAHAFFEY?

25          MR. BAILEY:  I DO.

26          THE COURT:  MR. NEWHOUSE, ARE YOU JUST SORT OF

1    HOPING I DON'T ASK YOU ANY QUESTIONS AT THIS POINT?

2            MR. NEWHOUSE:  I'M HOPING YOU DON'T ASK ME ANY

3    QUESTIONS, YOUR HONOR, BECAUSE I DON'T HAVE AN ANSWER TO

4    THAT ONE.

5            THE COURT:  THAT'S FINE.

6                MR. RUS, DO YOU HAVE A POSITION ON THIS?

7            MR. RUS:  NO, YOUR HONOR.

8            THE COURT:  MR. PALMER?

9            MR. PALMER:  I WELCOME YOUR HONOR'S QUESTIONS.

10               YES.  THE AGREEMENTS WERE APPROVED BY THE

11   BANKRUPTCY TRUSTEE.  THE BANKRUPTCY COURT AND IT PROVIDES

12   THAT THEY SHALL BE IN PLACE UNTIL THEY WERE MUTUALLY

13   TERMINATED.  THERE HAS BEEN NO SUCH MUTUAL TERMINATION.

14   THAT DOESN'T MEAN, HOWEVER, THAT THE AGREEMENT GIVES THEM

15   THE POWERS THEY SPEAK OF.

16               BUT TO DIRECTLY ANSWER YOUR QUESTION, THEY

17   ARE STILL IN PLACE.

18           THE COURT:  ALL RIGHT.  SO WHO SUBMITTED

19   MR. JOSEPH'S DECLARATION?

20           MR. PALMER:  I DID, YOUR HONOR.  AND HIS COUNSEL,

21   MR. RUS, IS HERE AS WELL.

22           THE COURT:  WELL, IT APPEARS TO THE COURT THAT THE

23   CONTROL OF ANGUS PETROLEUM IS WITH MR. SCOTT AND

24   MR. ZYLSTRA.  AND NOT MR. GRAYSON.

25               AND I AM NOT INCLINED TO TAKE YOU UP ON YOUR

26   SUGGESTION, MR. MAHAFFEY, THAT WE HAVE A TRIAL ON THIS

```
 1   ISSUE.  THE POSITION THAT YOU HAD -- THAT YOU TOOK COMING

 2   INTO THE HEARING ON THURSDAY SEEMS A LITTLE BIT DIFFERENT

 3   THAN THE POSITION YOU'RE TAKING NOW, WHICH IS FINE, YOU

 4   PROBABLY HAVE MORE INFORMATION NOW ABOUT WHERE WE'RE GOING

 5   WITH THIS.

 6          MR. MAHAFFEY:  NOT AT ALL.

 7          THE COURT:  BUT YOU'RE BASED -- YOUR POSITION IS

 8   BASED ON THE 2007 AGREEMENTS.

 9          MR. MAHAFFEY:  THE POSITION I HAVE FOR BOB GRAYSON,

10   THE INDIVIDUAL, AND BG OPERATIONS LLC IS THAT THOSE

11   AGREEMENTS SAY WHAT THEY SAY.

12              NOW, THOSE AGREEMENTS, FIRST OF ALL, DECLARE

13   IN THEM AT THE REQUEST OF THE TRUSTEE THAT IF THERE'S A

14   DISPUTE IN THEIR INTERPRETATION, BOTH PARTIES DIVESTED

15   JURISDICTION TO THE BANKRUPTCY COURT.  I THINK THAT'S WHY

16   MR. GRAYSON'S COUNSEL'S FILED THAT.

17              THIS IS CLEARLY AN INTERPRETATION DISPUTE.

18   ON THE ONE HAND, THE COURT AND NOW HAVE COUNSEL, HAVE

19   CONFIRMED THAT THERE'S A RATIFICATION OF THESE CONTRACTS.

20   THAT THEY SAY WHAT THEY SAY AND THEY'RE ENFORCE AND EFFECT.

21              THERE'S NO DISPUTE ABOUT THE HISTORY OF BG

22   OPERATIONS BEING IN CONTROL.  THE LEGAL QUESTION IS, IS WHEN

23   YOU APPOINT A BOARD OF DIRECTORS, DOES THE STATE OF

24   CALIFORNIA EITHER CORPORATION CODE OR CASES SAY THAT IF YOU

25   HAVE A PRE-EXISTING DELEGATED FULL RESPONSIBILITY DELEGATION

26   UNDER A JOINT OPERATING AGREEMENT BETWEEN AN OIL COMPANY AND
```

1   ITS INDEPENDENT DELEGATED OPERATOR IN CHARGE OF ALL

2   OPERATIONS, INCLUDING A SPECIFIC TERM THAT SAYS THEY CONTROL

3   AND SETTLE ALL LITIGATION, WHEN YOU APPOINT A BOARD OF

4   DIRECTORS, DOES THAT SOMEHOW DISPLACE AS A MATTER OF LAW

5   THAT PREVIOUS DELEGATION?  OBVIOUSLY IT DOES NOT.

6            IN FACT, MR. GRAYSON HIRED JIM SCOTT AND

7   LOUIS ZYLSTRA FIRST TO BE HIS STAFF.  UNDER PARAGRAPH 8, HE

8   HAD TO STAFF ANGUS.  THEY CAN BE DELEGATED AND WERE, YOUR

9   HONOR, DAILY TASKS OF ANGUS OPERATIONS.

10           THE RUB HERE IS NOT THAT MR. ZYLSTRA WASN'T

11  DELEGATED AND WAS FUNCTIONING AS A C.F.O.  IT'S NOT THE RUB

12  THAT MR. ZYLSTRA WASN'T A DIRECTOR.  THOSE WERE UNDISPUTED

13  FACTS.

14           THE BIG ISSUE THAT'S A QUESTION OF FACTUAL

15  INTERPRETATION, WHICH BOTH PARTIES HAVE A RIGHT TO PUT ON

16  TESTIMONY AND EVIDENCE, IS WHETHER OR NOT WHEN THE DELEGATED

17  AUTHORITY TO BOB GRAYSON WAS A RATIFIED EVENT IN 2009,

18  WHETHER OR NOT MR. ZYLSTRA'S SIMPLY ACTING UNDER THAT

19  AUTHORITY.

20           TO SAY THAT THERE'S BEEN A DISPLACEMENT MEANS

21  YOU HAVE TO SAY THE CONTRACT HAS A WATERED DOWN WORD "ALL."

22  IT'S NOT ALL.

23           THE COURT:  OKAY, MR. MAHAFFEY.

24           MR. MAHAFFEY:  IT'S SHARED.

25           THE COURT:  THANK YOU.

26           MR. PALMER, MR. MAHAFFEY SAID HE OFFERED YOU

```
 1   AN OPPORTUNITY TO -- WHAT WAS IT?
 2           MR. MAHAFFEY:  TO DECLARE THE CONTRACT TERMINATED,
 3   WHICH CLEARLY ELIMINATES THIS INTERPRETATION FACT ISSUE.
 4           THE COURT:  THANK YOU, IS THAT A NECESSARY STEP?
 5           MR. PALMER:  NO, NOT AT ALL, YOUR HONOR.
 6           THE COURT:  WHY NOT?
 7           MR. PALMER:  THE AGREEMENT CLEARLY PROVIDES THAT
 8   CERTAIN RIGHTS AND REMEDIES WERE PROVIDED TO MR. GRAYSON IN
 9   TURN FOR BECOMING ESSENTIALLY THE CREDITOR.  IN TURN FOR
10   THOSE, HE WAS TO HELP OUT WHEN ANGUS IS DOWN.
11           THE AGREEMENT FURTHER SAYS, UNTIL SUCH TIME
12   AS ANGUS IS ABLE TO OBTAIN MONEY TO PAY ITS OWN OBLIGATIONS.
13   ANGUS HAS BEEN DOING THAT AND THE ONLY EVIDENCE BEFORE YOUR
14   HONOR IS 2010.  WE SUBMITTED TO YOU THE EVIDENCE OF THE
15   ACCOUNTANT, THE OPERATIONS OFFICER AND MY CLIENT.  WE'VE
16   EVEN SUBMITTED TO YOU CHECKS FROM MY CLIENT TO MR. MAHAFFEY.
17   THUSLY, NOT SURPRISINGLY, WHEN THESE GENTLEMEN CAME IN AND
18   TOOK OVER AND STARTED MAKING MONEY, THEY HAVE NOT HAD ANY
19   FURTHER INVOLVEMENT WITH, MONEY FROM, LOANS FROM OR EVEN
20   SEEN MR. GRAYSON ON SITE.  HE HAS NO CREWS THERE, HE PUMPS
21   NO OIL, HE DOES NO WORK, HE SUBMITS NO INVOICES.  INDEED,
22   UNTIL HE SHOWED UP A FEW DAYS AGO AND WAS REMOVED BY THE
23   POLICE, HE'S NEVER EVEN BEEN ON SITE.
24           SO UNDER THE AGREEMENT'S OWN TERMS, YOUR
25   HONOR, HE WAS HIRED AS AN INDEPENDENT CONTRACTOR TO HELP AS
26   LONG AS ANGUS COULD NOT HELP.  IT HAS NOW DEMONSTRATED AS
```

1    HELPING ITSELF AND AT PRESENT HIS SERVICES ARE NOT NEEDED.

2             THE AGREEMENT DOES NOT NEED TO BE TERMINATED,

3    AND INDEED PROBABLY SHOULD BE DONE PROPERLY THROUGH THE

4    BANKRUPTCY COURTS, BUT AT PRESENT HE HAS NO AUTHORITY AND

5    WAS DELEGATED NO SUCH POWER.

6             THE COURT:  YES, MR. BAILEY?

7             MR. BAILEY:  YOUR HONOR, MR. PALMER MADE ONE POINT

8    THAT I AGREE WITH:  IT NEEDS TO BE DONE THROUGH THE

9    BANKRUPTCY HE COURT.  RESPECTFULLY, I DON'T THINK THIS COURT

10   HAS JURISDICTION, AS MR. PALMER JUST ADMITTED.  THE

11   CONTRACTS ARISE OUT OF THE POWERS OF THE TRUSTEE DEVOLVED TO

12   HIM BY THE BANKRUPTCY COURT.

13             IS THAT WE HAVE A MOTION PENDING, THE

14   BANKRUPTCY COURT IS EITHER GOING TO AGREE THAT THEY HAVE

15   JURISDICTION AND AGREE WITH OUR PAPERS THAT IT'S A COURT

16   PROCEEDING, OR THEY'RE NOT.

17             I DON'T THINK THERE'S ANY PREJUDICE TO

18   ANYBODY TO LET JUDGE ALBERT IN THE BANKRUPTCY COURT WEIGH IN

19   ON THIS BEFORE THIS COURT MAKES A DECISION.  I WOULD EXPECT

20   THAT JUDGE ALBERT WILL DO THAT SOMETIME WITHIN THE NEXT DAY

21   OR SO.

22             THE COURT:  MR. PALMER?

23             MR. PALMER:  ANGUS IS NOT IN BANKRUPTCY.  ANGUS HAS

24   A BOARD OF DIRECTORS THAT'S MADE ITS DECISION, WE'VE BEEN

25   ASKING FOR PERMISSION TO DO SO.

26             THE COURT:  THE TRUSTEE IN BANKRUPTCY IS THE ONE

1   WHO PUT MR. SCOTT AND MR. ZYLSTRA IN AS THE BOARD OF

2   DIRECTORS, CORRECT?

3        MR. PALMER:  YES, HE IS HERE AND VERY PLEASED WITH

4   OUR RUNNING OF THE COMPANY AND SUPPORTS OUR DECISION.

5        THE COURT:  THERE'S A BIT OF A DISCONNECT HERE,

6   MR. BAILEY.  AND I UNDERSTAND MR. GRAYSON'S POSITION AS A

7   CREDITOR FOR ANGUS.

8             WHAT I DON'T UNDERSTAND IS AN INDIVIDUAL WHO

9   APPARENTLY HAS AN ONGOING RELATIONSHIP WITH BG OPERATIONS,

10  WHICH IS NO LONGER A PARTY.  BG OPERATIONS IS NOT BEFORE

11  THIS COURT.  ANGUS PETROLEUM IS.

12            ANGUS PETROLEUM HAS A DIFFERENT BOARD OF

13  DIRECTORS.  SO I'VE GOT A BIG DISCONNECT HERE.

14       MR. BAILEY:  CAN I WEIGH IN ON THAT, YOUR HONOR?

15       THE COURT:  PLEASE, I WOULD APPRECIATE IT.

16       MR. BAILEY:  A CORPORATION IS NOT CONTROLLED AND

17  OWNED BY ITS SHAREHOLDERS.  IN THIS PARTICULAR INSTANCE,

18  MR. JOSEPH IS THE SOLE SHAREHOLDER OF ANGUS.  WITH THE

19  BANKRUPTCY COURT'S APPROVAL, HE HAS APPOINTED MR. SCOTT AND

20  MR. ZYLSTRA AS DIRECTORS OF ANGUS.

21            ANGUS, AS I UNDERSTAND IT, IS IN A JOINT

22  VENTURE PARTNERSHIP WITH BG OPERATIONS.  AND WITH BANKRUPTCY

23  COURT APPROVAL, MR. JOSEPH RATIFIED THE ASSIGNMENT OF ALL OF

24  THE OPERATIONS AND THE CONTROL OF ALL THE OPERATIONS TO BG

25  OPERATIONS.

26            THEREFORE, HE HAS DELEGATED ALL THAT

1   AUTHORITY TO BG OPERATIONS THROUGH HIS POWERS VESTED IN HIM

2   BY THE BANKRUPTCY COURT.

3          THE COURT:  MR. JOSEPH, COULD YOU COME UP HERE,

4   COULD YOU KIND OF STEP UP, SIR?

5               ARE YOU AN ATTORNEY, MR. JOSEPH?

6          MR. JOSEPH:  I AM.

7          THE COURT:  DO YOU AGREE WITH MR. BAILEY THAT JUDGE

8   ALBERT NEEDS TO MAKE A DECISION BEFORE THIS COURT COULD GO

9   AHEAD AND ACT ON THE EX-PARTE APPLICATION?

10         MR. JOSEPH:  I DO NOT.

11         THE COURT:  WHY NOT?

12         MR. JOSEPH:  THIS COURT HAS THE UNDISPUTED RIGHT

13  AND POWER TO CONTROL WHAT GOES ON BEFORE IT.  THERE'S

14  LITIGATION PENDING BEFORE IT.  IT IS WITHIN THIS COURT'S

15  PROVINCE AND NO OTHER COURT'S PROVINCE TO DETERMINE WHAT

16  ATTORNEYS ARE REPRESENTING A PARTY BEFORE THIS COURT.

17         THE COURT:  WERE YOU ABLE TO FOLLOW THE ARGUMENT

18  ABOUT THE 2007 AGREEMENT THAT WOULD GIVE BG OPERATIONS AND

19  BY EXTENSION MR. GRAYSON CONTROL OVER ANGUS PETROLEUM'S ROLE

20  IN THE LITIGATION IN FRONT OF THIS COURT?

21         MR. JOSEPH:  I FOLLOW, BUT DISAGREE.

22         THE COURT:  OKAY.  CAN YOU GIVE ME A SUMMARY OF WHY

23  YOU DISAGREE?

24         MR. JOSEPH:  IF I MAY.

25         THE COURT:  PLEASE.

26         MR. JOSEPH:  THE MODIFICATION AGREEMENT, WHICH I

1    RATIFIED AND WHICH THE BANKRUPTCY COURT APPROVED, SAYS THE

2    FOLLOWING:  AND I PARAPHRASE:

3              ANGUS, NOT MR. GRAYSON, NOT BG OPERATIONS,

4    BUT ANGUS SHALL USE ITS BEST EFFORTS -- ENDEAVOR TO USE ITS

5    BEST EFFORTS TO RETAIN MR. MAHAFFEY ON AN CONTINGENT FEE

6    BASIS TO PURSUE CERTAIN MATTERS.

7              TO MY KNOWLEDGE -- I DON'T WANT TO SPEAK TO

8    THE ISSUE OF WHETHER SUCH AN ACCEPTABLE CONTINGENCY FEE

9    ARRANGEMENT WAS EVER REACHED BETWEEN ANGUS THROUGH ITS

10   OFFICERS AND MR. MAHAFFEY.

11             WHAT I CANNOT CONTEMPLATE IS THAT A PROVISION

12   WHICH SAYS THAT ANGUS SHALL USE EFFORTS TO EMPLOY

13   MR. MAHAFFEY, AND IF IT WERE TO DO SO, THAT IT FOLLOWS FROM

14   THAT IF MR. MAHAFFEY AND ANGUS HAVE DIFFERENCES, AS CLIENTS

15   AND ATTORNEYS DO HAVE DIFFERENCES SOMETIMES, THAT SOMEHOW

16   THAT PROVISION SHOULD BE READ AS ANGUS SHALL ENDEAVOR TO

17   HIRE MR. MAHAFFEY, BUT IF DIFFERENCES DEVELOP BETWEEN THE

18   BOARD AND THE MANAGEMENT OF ANGUS AND MR. MAHAFFEY,

19   NEVERTHELESS, IT MAY NEVER DISCHARGE HIM.  I THINK THAT

20   CANNOT BE THE LAW.

21             THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH,

22   MR. JOSEPH.

23             MR. PALMER, IT'S YOUR EX-PARTE MOTION, DO YOU

24   HAVE ANY CONCLUDING REMARKS?

25             MR. PALMER:  I THINK YOUR HONOR HAS THE ISSUES WELL

26   IN MIND AND THE RATHER BASIC AND DIRECT COMMENTS BY

1    MR. JOSEPH HAVE BEEN VERY HELPFUL.  NO, UNLESS YOUR HONOR

2    HAS FURTHER QUESTIONS, I DO NOT.

3            THE COURT:  OKAY, THANK YOU.

4            MR. MAHAFFEY:  I WOULD LIKE TO MAKE ONE MORE

5    COMMENT JUST QUICKLY, BECAUSE MR. JOSEPH SPOKE TO THIS

6    PARAGRAPH.  I THINK IT'S INCUMBENT THAT THIS COURT RECOGNIZE

7    THAT THIS DOCUMENT HE WAS REFERRING TO HAS SPECIFIC DETAILED

8    PARAGRAPHS BETWEEN THE PARTIES WHO NEGOTIATED IT.  THERE HAS

9    BEEN NOTHING BUT A DIFFERENCE IN INTERPRETATION OF THIS

10   DOCUMENT PRESENTED TO THIS COURT.  NO DUE PROCESS HAS BEEN

11   PROVIDED TO ANGUS TO INTERPRET IT ACCORDING TO THEIR

12   TESTIMONY WITH CROSS-EXAMINATION, NO DUE PROCESS HAS BEEN

13   PROVIDED TO BG OPERATIONS.  THIS CLAUSE IS, AT BEST,

14   AMBIGUOUS.

15            PRICE FIRST *NET WOULD AUTOMATICALLY REQUIRE

16   THAT A QUESTION OF FACT BE PRESENTED TO SEE WHETHER OR NOT

17   IT WAS REASONABLY SUSCEPTIBLE TO ALTERNATIVE MEANINGS.

18            THIS IS AN EX-PARTE APPLICATION.  YOU HAVE

19   OFFERS OF PROOF, I GUESS.  COUNSEL'S NOT BEEN SWORN IN TO

20   TESTIFY.  NO ONE HAS PRESENTED ANY EXPERTS OR WITNESSES.

21   AND THE ESSENCE OF THIS IS MR. GRAYSON CONTENDS, AND SINCE I

22   REPRESENT THE PARTNERSHIP, WHICH IS MY DUTY OF LOYALTY --

23            THE COURT:  WHICH PARTNERSHIP DO YOU REPRESENT?

24            MR. MAHAFFEY:  THE BG XTO PARTNERSHIP -- THE BG

25   OPERATIONS ANGUS PARTNERSHIP, I MISSPOKE.  THAT 2007

26   25 PERCENT, 75 PERCENT PROFIT SPLITTING, EXPENSE SPLITTING,

1  CAPITAL VENTURE PARTNERSHIP THAT HAS BEEN CARRIED ON FOR

2  FOUR YEARS IS A SEPARATE LEGAL ENTITY.

3            MR. GRAYSON AND ANGUS ARE REAL PARTIES IN

4  INTEREST IN THE OUTCOME OF WHETHER OR NOT THIS COURT

5  DECLARES OR DOESN'T DECLARE THE OWNERSHIP INTEREST IN THE

6  ELYSIUM, ANGUS LEASES TO BE 100 PERCENT ANGUS OR 50/50.

7  MR. GRAYSON IS A DIRECT BENEFICIARY, IN FACT, HE GETS THE

8  MAJORITY OF THE UPSIDE.

9            THE COURT:  MR. MAHAFFEY, YOU UNDERSTAND THIS

10 EX-PARTE HAS NOTHING TO DO WITH THE MERITS OF THE LITIGATION

11 CURRENTLY BEFORE THE COURT.  IT IS AN EX-PARTE APPLICATION

12 BY ONE PARTY -- ONE PARTY -- TO DISCHARGE ITS CURRENT

13 ATTORNEY AND BRING ON SOMEBODY ELSE.  THAT'S WHAT WE'RE

14 TALKING ABOUT HERE.

15           MR. MAHAFFEY:  I APOLOGIZE IF I DIDN'T SAY THAT

16 CLEARLY, BUT WHEN MR. JOSEPH AND DON WHITE ACTUALLY SIGNED

17 IT FOR ANGUS SAID, THE STOCK OF ANGUS -- THIS IS

18 PARAGRAPH 11 -- IS A WHOLLY-OWNED -- IS WHOLLY-OWNED BY

19 SOUTH COAST OIL CORPORATION BANKRUPTCY ESTATE.  AND ANGUS

20 AND BG, THEREFORE, AGREE THAT THE BANKRUPTCY COURT IN THE

21 SCLC CASE SHALL HAVE THE SOLE AND EXCLUSIVE JURISDICTION TO

22 DETERMINE ANY DISPUTE UNDER THE AGREEMENT OR THIS

23 MODIFICATION.

24           AND YOU'VE GOT ATTORNEYS ON BOTH SIDES OF

25 THIS GIVING YOU IN AN EX-PARTE APPLICATION THEIR

26 INTERPRETATION OF THIS DISPUTE.  IF YOU AGREED WITH

1   MR. GRAYSON'S COUNSEL'S INTERPRETATION, THEN UNDER THE

2   DELEGATION OF AUTHORITY IN '07, FULLY RATIFIED IN '09, UNDER

3   PARAGRAPH 13.4 OF THE ATTACHMENT, IT SAYS POINT BLANK, THE

4   OPERATOR CONTROLS ALL LITIGATION AND THE SETTLEMENT THEREOF.

5   HE SAYS YOU DELEGATE IT TO ME.

6              IF YOU ACCEPT MR. PALMER'S NON-SWORN

7   TESTIMONY THAT MR. GRAYSON AND THIS CONTRACT DO NOT CREATE A

8   PARTNERSHIP, HE'S ONLY A CREDITOR, THE INTERPRETATION IS

9   COMPLETELY REPUGNANT TO THAT, ACCORDING TO MR. GRAYSON'S

10  COUNSEL, THEN YOU WOULD BE ABLE TO FOLLOW THE PATHWAY THAT

11  THIS DID NOT DIVEST THAT ASPECT OF CONTROL OF THIS

12  LITIGATION, WHICH MR. GRAYSON AND BG OPERATIONS ARE REAL

13  PARTIES IN INTEREST.

14             MY POINT IS NOT WHETHER OR NOT THE COURT MAY

15  BE GETTING IT RIGHT TODAY, OR WHETHER THE COURT'S GETTING IT

16  WRONG; MY POINT IS HOW DID THEY RUSH A SUPERIOR COURT INTO

17  WHAT IS A LEGITIMATE FACTUAL INTERPRETATION WITH ALL THE

18  PARTIES AVAILABLE FOR DUE PROCESS RIGHTS BECAUSE THERE'S

19  SOME IMPACT ON LITIGATION?  THERE'S NO IMPACT.  BOTH OF

20  THESE PARTIES COULD EASILY ASSOCIATE IN THEIR OWN CHOICE OF

21  COUNSEL.  IT DOESN'T HAVE TO BE DOUG MAHAFFEY.  I'VE GOT NO

22  AFFECTION FOR RUNNING IN THIS LITIGATION OR BEING INVOLVED

23  FOR EITHER SIDE.

24             THE COURT:  WELL, MR. MAHAFFEY, WERE YOU ASKED TO

25  SIGN A SUBSTITUTION OF ATTORNEY FORM, YES OR NO?

26             MR. MAHAFFEY:  I WAS ASKED THAT.

1          THE COURT:  AND YOU REFUSED.

2          MR. MAHAFFEY:  MR. GRAYSON REFUSED TO LET ME SIGN

3  THAT.

4          THE COURT:  THAT'S FINE.  ALL RIGHT.  THANK YOU.

5              YOU GET TO CONCLUDE, MR. PALMER, ANYTHING

6  ELSE?

7          MR. PALMER:  NO.  JUST VERY SIMPLY, I'VE HEARD OF A

8  MYTHICAL PARTNERSHIP AGREEMENT THAT WAS ENTERED INTO, THERE

9  WAS NO SUCH AGREEMENT.  MR. MAHAFFEY JUST QUOTED FROM THE

10  AGREEMENT WE PRESENTED TO YOUR HONOR, WHICH COULDN'T MORE

11  CLEARLY BE ENTITLED "INDEPENDENT CONTRACTOR AGREEMENT."  ITS

12  LANGUAGE SAYS IT'S BEING DONE FOR THE PURPOSE OF THEM TO

13  HIRE THEM AS AN INDEPENDENT CONTRACTOR ON BEHALF OF ANGUS,

14  IT DOESN'T CREATE A PARTNERSHIP OR FIDUCIARY DUTY.  I

15  BELIEVE YOUR HONOR HAS THE FACTS WELL IN HAND.

16          THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.

17              WELL, THEN, THE COURT WILL GRANT THE EX-PARTE

18  APPLICATION TO THE EXTENT THAT IT ASKS -- BASED ON THE

19  REQUEST BY ANGUS PETROLEUM THROUGH MR. ZYLSTRA.

20          MR. PALMER:  YES, YOUR HONOR.

21          THE COURT:  WHO WAS PLACED ON THE BOARD OF

22  DIRECTORS.

23          MR. PALMER:  AND HE IS HERE.

24          THE COURT:  MR. ZYLSTRA'S IN THE COURTROOM.  HE WAS

25  PLACED ON THE BOARD OF DIRECTORS BY MR. JOSEPH -- AND THIS

26  WAS APPROVED THEN BY JUDGE ALBERT --

1          MR. PALMER:  YES.

2          THE COURT:  -- IN THE BANKRUPTCY COURT.

3               THE DUE PROCESS ISSUE AT STAKE HERE IS A

4   PARTY'S RIGHT TO SELECT ITS COUNSEL OF CHOICE.  THAT'S

5   REALLY WHAT WE'RE TALKING ABOUT.

6          MR. PALMER:  YES, YOUR HONOR.

7          THE COURT:  ANGUS PETROLEUM IS THE PARTY IN THIS

8   CASE.  AND ANGUS HAS INDICATED THAT IT WOULD LIKE TO MAKE A

9   CHANGE IN ITS REPRESENTATION.  SO I DON'T APPOINT YOU,

10  MR. PALMER.  THE ONLY THING THIS COURT WOULD DO WOULD BE

11  THEN TO ADVISE YOU, MR. MAHAFFEY, THAT BASED ON THE REQUEST

12  BY ANGUS PETROLEUM THROUGH MR. ZYLSTRA, YOU ARE NO LONGER

13  THE COUNSEL OF RECORD.

14               NOW, HOW LONG WILL IT TAKE FOR YOU -- I

15  ASSUME YOU'RE GOING TO SUBSTITUTE IN, MR. PALMER?

16          MR. PALMER:  IMMEDIATELY.

17          THE COURT:  HOW LONG WILL IT TAKE YOU,

18  MR. MAHAFFEY, TO DELIVER YOUR FILES TO MR. PALMER'S OFFICE?

19          MR. MAHAFFEY:  I RAISED THAT, YOUR HONOR.  THAT'S

20  AN EXTREMELY COMPLICATED PROBLEM.  AND I CANNOT HANDLE --

21  PROBABLY I'M GOING TO NEED TO SEEK THE STATE BAR.  I'M SURE

22  WHAT WE'RE GOING TO BE DOING IS FILING A REQUEST FOR

23  INTERVENTION.  I'VE GOT A DILEMMA.

24          THE COURT:  WHAT'S YOUR DILEMMA?

25          MR. MAHAFFEY:  MY DILEMMA IS WHAT I DECLARED TO

26  YOU.  THOSE FILES ARE OWNED BY OTHER CLIENTS.  THIS COURT --

```
 1   NOT THIS COURT, BUT YOUR PREDECESSOR COURT, STAYED DISCOVERY
 2   IN OCTOBER OF '09 BECAUSE THERE WAS A VERY COMPLICATED
 3   O.S.C. RE:  CONTEMPT THAT INVOLVED TENS OF THOUSANDS OF
 4   RECORDS.
 5          THE COURT:  OKAY.  MR. MAHAFFEY, IN THE COURT'S
 6   VIEW THE ISSUE CAN BE MADE A LITTLE LESS COMPLICATED.  I
 7   ASSUME, AS COUNSEL OF RECORD FOR ANGUS PETROLEUM, YOU KEPT
 8   RECORDS FOR ANGUS PETROLEUM.  ANGUS IS YOUR CLIENT IN THIS
 9   LITIGATION.
10             NOW, AT ONE POINT YOU ALSO REPRESENTED BG
11   OPERATIONS, CORRECT?
12          MR. MAHAFFEY:  I REPRESENTED THE RELATIONSHIP WITH
13   BG AS A PARTY AND ANGUS AS A PARTY.  THERE'S NO OTHER WAY TO
14   DESCRIBE IT.  THEY ARE --
15          THE COURT:  AND THAT WAS CALLED?  WHAT WAS THAT
16   OPERATION CALLED?
17          MR. MAHAFFEY:  BG OPERATIONS AND ANGUS'S JOINT
18   VENTURE, THE ONE THAT THEY HAVE BEEN SHARING PROFITS ON FOR
19   FOUR YEARS.
20          THE COURT:  EXCUSE ME.  IN THIS LITIGATION, BG
21   OPERATIONS ITSELF AS AN ENTITY, A LIMITED LIABILITY COMPANY,
22   WAS INITIALLY THE PLAINTIFF AND THEN A CROSS-DEFENDANT, IS
23   THAT --
24          MR. MAHAFFEY:  CORRECT.
25          THE COURT:  I'LL ASK YOU, MR. NEWHOUSE; IS THAT
26   CORRECT?
```

1          MR. NEWHOUSE:  THAT'S CORRECT, YOUR HONOR.

2          THE COURT:  AND MR. MAHAFFEY REPRESENTED BG

3  OPERATIONS.

4          MR. NEWHOUSE:  HE DID.

5          THE COURT:  BUT YOU ALSO THEN REPRESENTED -- AT ONE

6  POINT YOU REPRESENTED BOTH ANGUS AND BG AT THE SAME TIME.

7          MR. NEWHOUSE:  AT THE VERY INSTANT THAT

8  MR. MAHAFFEY FILED THIS LAWSUIT WITH BG AS HIS CLIENT, HE

9  ALSO REPRESENTED ANGUS IN OTHER LITIGATION, AND WE POINTED

10 OUT THE EXISTENCE OF THE CONFLICT AT THAT TIME.

11         THE COURT:  I'M CONCERNED ABOUT THE FILES FOR ANGUS

12 PETROLEUM IN THIS CASE.

13         MR. MAHAFFEY:  THOSE ARE NOT A PROBLEM.

14         THE COURT:  OKAY.

15         MR. MAHAFFEY:  WHAT I'VE --

16         THE COURT:  THAT'S WHAT WE'RE TALKING ABOUT.

17         MR. MAHAFFEY:  WELL, I WANT TO BE SURE THAT WE'RE

18 NOT --

19         THE COURT:  WHAT ELSE -- MR. MAHAFFEY, EXCUSE ME.

20 WHAT ELSE WOULD WE BE TALKING ABOUT?  YOU ARE -- UP UNTIL A

21 FEW MINUTES AGO -- HAVE BEEN ANGUS PETROLEUM'S ATTORNEY.

22 YOUR OTHER CLIENTS ARE NOT A CONCERN TO THIS COURT.  I'M

23 CONCERNED ABOUT YOUR FILES FOR ANGUS PETROLEUM.  THAT'S NOT

24 A PROBLEM.

25              SO HOW QUICKLY CAN THEY GET OVER TO

26 MR. PALMER?

1         MR. MAHAFFEY:  I THINK BY THE CLOSE OF BUSINESS

2    NEXT WEEK.  I'LL NEED FIVE TO SEVEN DAYS TO COPY THE ANGUS

3    ONLY FILES OR THE JOINTLY OWNED ANGUS FILES.  THOSE AREN'T

4    ALL THE FILES.  THE ENTIRE OPPOSITION TO THE SUMMARY

5    JUDGMENT MOTION THAT'S UNDER SUBMISSION WITH THIS COURT IN

6    ITS ENTIRETY WAS OPPOSED WITH ATTACHMENTS AND FILES FROM THE

7    BANKRUPTCY COURT CASE.  ANGUS IS DEPENDENT AND THERE'S NO

8    STANDARD OF CARE THAT WOULD EVER ALLOW AN EXCEPTION TO HAVE

9    NOW TAKE OVER --

10        THE COURT:  MR. MAHAFFEY, LET'S JUST MAKE IT VERY

11   SIMPLE.  IF YOU HAVE FILES AND RECORDS THAT YOU THINK MAYBE

12   WOULD NEED TO GO TO MR. PALMER, BUT YOU'RE NOT SURE, WHY

13   DON'T YOU CREATE A LOG, CALL IT A PRIVILEGE LOG OR WHATEVER,

14   SO THAT IF IT COMES UP, WE CAN THEN FIGURE OUT AND YOU CAN

15   EITHER SUBMIT THE LOG TO MR. PALMER ALONG WITH THE FILES,

16   AND IF THERE IS ANY ISSUE, WE CAN DEAL WITH THAT LATER,

17   OKAY?

18        MR. MAHAFFEY:  THOSE ARE 50 TO A HUNDRED BOXES, IT

19   WILL TAKE ME NO LESS THAN 30 DAYS TO LOG THOSE, AS I WILL

20   GLADLY DO, BUT IT'S AN ENORMOUS UNDERTAKING.

21        THE COURT:  YOU CAN GET THE FILES TO WILL --

22   ANYTHING THAT WAS FILED WITH THIS COURT SHOULDN'T BE A

23   PROBLEM.

24        MR. MAHAFFEY:  THAT'S NOT A PROBLEM.

25        THE COURT:  YOUR OTHER FILES THAT PERTAIN TO YOUR

26   REPRESENTATION IN THIS MATTER OF ANGUS PETROLEUM, YOU CAN

1   HAVE BY THIS TIME NEXT WEEK, SO THAT WHAT DAY IS THAT?

2   CLOSE OF BUSINESS ON JUNE 7TH?

3           ACCEPTABLE, MR. PALMER?

4           MR. PALMER:  YES.  TO MAKE IT EASIER, IF --

5   MR. MAHAFFEY HAS REPRESENTED IN HIS LAST DECLARATION THAT

6   THERE WERE ONLY TWO BOXES OF DOCUMENTS.  IF HE IS BUSY, I

7   COULD SEND A COPY SERVICE OVER AT MY EXPENSE TOMORROW, AND I

8   WOULD HAVE THE ENTIRE FILE BY CLOSE OF BUSINESS TOMORROW.

9           THE COURT:  OKAY.  LET'S DO THAT.

10          MR. MAHAFFEY:  THE TWO BOXES -- WE'RE PLAYING GAMES

11  HERE WITH THIS COURT.

12          THE COURT:  THERE ARE NO GAMES.  WE'RE NOT PLAYING

13  GAMES, MR. MAHAFFEY.  DID YOU HAVE TWO BOXES, OR NOT?

14          MR. MAHAFFEY:  NO, NOT JUST TWO.  I HAVE PLEADINGS

15  IN THIS FILE THAT BEAR THEIR CASE NUMBER, YOUR HONOR, THAT

16  PROBABLY TAKE UP TWO BOXES IN TERMS OF THE DISCOVERY, WHAT'S

17  BEEN FILED, THE SUMMARY JUDGMENT MOTION.

18          I HAVE 50 TO A HUNDRED BOXES OF RELEVANT

19  FILES THAT ANGUS HAS BEEN RELYING ON THAT IF I'M GOING TO

20  HAVE TO LOG, I WILL TAKE THE TIME TO LOG IT.  THOSE FILES

21  DON'T BELONG TO ANGUS, THEY WERE BANKRUPTCY COURT FILES FROM

22  OTHER CLIENTS INCLUDING BOB GRAYSON, THE INDIVIDUAL, WHO IS

23  A PETITIONING CREDITOR AND OTHER CREDITORS IN THAT CASE.

24          THE COURT:  EXCUSE ME.  WE'RE TALKING ABOUT THE

25  FILES, OKAY?  SO MR. PALMER IS GOING TO SEND OVER A COPY

26  SERVICE AT HIS EXPENSE TOMORROW.  HE WILL COPY THE TWO

1   BOXES, OR WHATEVER.  YOU'RE GOING TO START WORKING ON A

2   PRIVILEGE LOG, OKAY?

3          MR. MAHAFFEY:  I UNDERSTAND.

4          THE COURT:  YOU CAN HAVE THE PRIVILEGE LOG TO

5   MR. PALMER BY MONDAY, JUNE 27TH?

6          MR. MAHAFFEY:  I CAN MAKE BEST EFFORTS.  IF I NEED

7   ADDITIONAL TIME I'LL FILE WITH THE COURT A REQUEST FOR THAT.

8   IT'S A TREMENDOUS UNDERTAKING.

9          THE COURT:  WELL, MAYBE WHEN YOU START GOING

10  THROUGH IT, YOU MIGHT REALIZE IT'S NOT SO MUCH.

11              THEN IF YOU CAN WORK OUT AMONGST -- BETWEEN

12  YOURSELVES, IF YOU COME ACROSS DOCUMENTS THAT YOU DON'T NEED

13  TO DOCUMENT IN THE PRIVILEGE LOG, BUT YOU CAN IN FACT THEN

14  TURN OVER TO MR. PALMER FOR HIS REPRESENTATION OF ANGUS

15  PETROLEUM, YOU CAN LET MR. PALMER KNOW AND YOU CAN SEND

16  OVER -- IF YOU SO CHOOSE, YOU CAN SEND OVER A COPY SERVICE

17  TO COPY THOSE.

18          MR. PALMER:  WE'D BE MORE THAN HAPPY TO.

19          MR. MAHAFFEY:  JUST A LITTLE CLARIFICATION, AND

20  THEN I WILL LEAVE.  THIS CONTRACT INTERPRETATION, WHICH NOW

21  HAS BEEN ESSENTIALLY RULES THAT REQUIRES BOTH THE

22  DIVESTITURE OF THE FILES AND THE PRIVILEGE LOG, IS IT A

23  STIPULATED FACT FROM ALL COUNSEL REPRESENTING THE WARRING

24  PARTIES THAT THIS IS THE HEARING ON THE CONTRACT

25  INTERPRETATION ON THIS ISSUE, BUT THEY ARE NOT RESERVING

26  THEIR RIGHTS TO RELITIGATE IT --

1    THE COURT:  MR. MAHAFFEY, I'M SORRY, YOU DIDN'T

2  BRING THE EX-PARTE MOTION, YOU DIDN'T RULE ON THE EX-PARTE

3  MOTION.  AND THE COURT IS REALLY NOT GOING TO PERMIT YOU TO

4  GO AHEAD AND COUCH IT IN TERMS -- THERE REALLY ARE NO

5  WARRING PARTIES HERE.  A PARTY TO THIS LITIGATION HAS ASKED

6  TO REPLACE ITS COUNSEL OF RECORD.  THAT WAS WHAT THE

7  EX-PARTE APPLICATION -- AND ALSO FOR A CONTINUANCE, AND

8  WE'LL GET TO THE CONTINUANCE IN A MOMENT.

9    THAT'S WHAT THIS COURT HAS RULED ON.  SO I AM

10 NOT GOING TO PERMIT YOU TO MAKE THIS HEARING SOMETHING OTHER

11 THAN WHAT IT IS, OKAY?

12    THERE ARE NO WARRING PARTIES HERE.  WE'RE

13 ONLY TALKING ABOUT ONE PARTY IN THIS LITIGATION.

14    MR. MAHAFFEY:  THERE'S A DISPUTE OVER CONTRACT

15 INTERPRETATION --

16    THE COURT:  MR. MAHAFFEY, DID YOU NOT HEAR THE

17 COURT?  I AM RULING ON THE EX-PARTE APPLICATION BY -- FILED

18 BY MR. PALMER ON BEHALF OF ANGUS AND MR. ZYLSTRA, OKAY?

19    NOW, I THINK WE CONTINUED EVERYTHING FOR AT

20 LEAST 90 DAYS.

21    MR. PALMER:  YES, WE THANK YOU FOR THAT AS WELL,

22 YOUR HONOR.

23    THE COURT:  SEPTEMBER 16TH, I'M NOT HERE

24 SEPTEMBER 16TH.  SOMEBODY NEEDED TO CHECK WITH THEIR CLIENT

25 IN ANY EVENT, I CAN FIND SOMEBODY TO BE HERE, BUT IF YOU'D

26 LIKE ANOTHER DAY, WE CAN DO THAT AS WELL.

1     MR. NEWHOUSE:  WE CHECKED, YOUR HONOR, THE 16TH IS

2  AVAILABLE TO US, BUT OBVIOUSLY WE WILL ACCOMMODATE THE

3  COURT'S CALENDAR.

4     MR. PALMER:  WHAT WORKS FOR YOUR HONOR?

5     MR. NEWHOUSE:  YES, PLEASE.

6     THE COURT:  WOULD YOU LIKE THE 23RD OR THE 30TH?

7  ALTHOUGH THE 30'S IS PART OF -- ROSH HASHANA.

8     MR. NEWHOUSE:  23RD WORKS FOR XTO, ELYSIUM AND E&B.

9     MR. PALMER:  AS WELL AS ANGUS.

10     THE COURT:  YOU'RE THE TWO I'M CONCERNED WITH.

11  SEPTEMBER 23RD, WHAT TIME WOULD YOU LIKE?

12     MR. PALMER:  YOUR PREFERENCE, YOUR HONOR.

13     MR. NEWHOUSE:  WE WOULD PREFER ANYTIME AFTER

14  10 O'CLOCK IN THE MORNING?

15     THE COURT:  10:30 ON SEPTEMBER 23RD.

16     MR. NEWHOUSE:  PERFECT.

17     THE COURT:  WE WILL CONTINUE THE PENDING MOTIONS,

18  THE MOTION FOR SUMMARY JUDGMENT, SUMMARY ADJUDICATION, WHAT

19  ELSE ARE WE CONTINUING?

20     [!EZ SPEAKER 03]:  THE STEVE SEW GUARD MOTION TO

21  QUASH.

22     THE COURT:  AND THE M.S.C.

23     MR. PALMER:  OUR UNDERSTANDING FROM YOUR RESEARCH

24  ATTORNEY AND TEMPORARY JUDGE, WHO WAS VERY HELPFUL, BY THE

25  WAY, INDICATED THAT IT WOULD BE THIS COURT'S PREFERENCE TO

26  HAVE THE M.S.C. ON THAT DATE, DEPENDING ITS OUTCOME, THEN

1   PICK SPECIFIC DATES THAT THE PARTIES DIDN'T PREPARE FOR A

2   MOTION THAT PROBABLY WON'T GO FORWARD ON THAT DATE.

3          MR. NEWHOUSE:  MORE IMPORTANTLY, SO THE COURT DOES

4   HAVEN'T TO BEAR A RULING IF WE ARE ABLE TO RESOLVE THE

5   MATTER.

6          THE COURT:  WHEN WE COME ON THE 23RD, IF WE NEED

7   TO -- IF WE GIVE YOU A DATE TODAY, IT WOULD BE THINK

8   WEDNESDAY.  SO REALISTICALLY, IT COULD BE ANY WEDNESDAY FROM

9   OCTOBER 5TH ON, JUST PICK ONE.

10         MR. NEWHOUSE:  I AGREE.  MY SUGGESTION, YOUR HONOR,

11  IS LET'S DO THE M.S.C.  I'M CAUTIOUSLY OPTIMISTIC, GIVEN THE

12  PROSECUTING THAT THE PARTIES HAVE MADE TALKING TO EACH

13  OTHER, WHICH IS ONE REASON WHY WE ASKED FOR THE LENGTH OF

14  TIME, THAT ALL THE MOTIONS AND EVERYTHING ELSE WILL BECOME

15  MOOT.  AND WE WON'T HAVE TO DECIDE IT.  SO LET'S JUST PLAY

16  IT BY HEAR.

17         THE COURT:  YES, MR. BAILEY.

18         MR. BAILEY:  IN LIGHT OF THE FACT THAT SOME OF

19  THESE FILES MAY INDEED BE IN THE PROPERTY OF ELYSIUM, WE'LL

20  HAVE A CLAIM OR MAY HAVE A CLAIM THAT SOME OF THESE PROPERTY

21  OF B&G OPERATIONS AND/OR MR. GRAYSON, MAY I REQUEST THAT I

22  BE COPIED ON ANYTHING BETWEEN MR. PALMER AND MR. MAHAFFEY ON

23  THAT REGARD SO IF THERE IS SOMETHING THAT MR. GRAYSON --

24         MR. RUS:  HE'S FREE TO DO WHATEVER HE LIKES ON

25  BEHALF OF MR. GRAYSON AT HIS EXPENSE, WE HAVE NO OBJECTION.

26         THE COURT:  MR. MAHAFFEY, DO YOU?

1    MR. MAHAFFEY:  NO, I AGREE.  I THINK HE'S ASKING

2 FOR COMMUNICATION FROM MR. PALMER.  WE OBVIOUSLY WILL BE --

3    THE COURT:  HE'S ASKING FOR COMMUNICATION FROM YOU

4 IN TERMS OF, HE WOULD LIKE TO RECEIVE THE PRIVILEGE LOG THAT

5 YOU'RE GOING TO SEND TO MR. PALMER.

6    MR. BAILEY:  I ALSO WOULD LIKE TO RECEIVE ANYTHING

7 FROM MR. PALMER THAT IS COMMENTING ON THE PRIVILEGE LOG OR

8 MAKING ANY REQUEST FOR DOCUMENTS.

9    THE COURT:  YOU SEEM TO HAVE A MUTUAL CLIENT.  SO I

10 THINK SERVICE ON MR. MAHAFFEY WILL CONSTITUTE SERVICE ON

11 MR. BAILEY.

12    YOUR POSITION, MR. MAHAFFEY, IS THAT YOU

13 REPRESENT GRAYSON AND BG AND THE PARTNERSHIP AS WELL.

14    MR. MAHAFFEY:  I THINK HE WAS JUST REQUESTING, AND

15 I WOULD AGREE, I'LL PROVIDE HIM COPIES, I THINK WOULDN'T BE

16 THAT BIG OF A BURDEN ON GIBSON DUNN TO INCLUDE THE BAILEY

17 FIRM.

18    THE COURT:  MR. MAHAFFEY, I'M REALLY TRYING TO KEEP

19 THIS FOCUSED ON THE CAUSES OF ACTION, AND I THINK THEY'RE

20 ALL CROSS-COMPLAINTS THAT ARE BEFORE THIS COURT.  IT MAY

21 WIND UP THAT WE CAN'T DO IT, BUT WE'RE GOING TO GIVE IT A

22 TRY.  SO IF YOU WILL BE SO KIND AS TO SERVE THE PRIVILEGE

23 LOG ONTO MR. BAILEY, THEN WE'LL KIND OF PLAY IT BY EAR,

24 OKAY?

25    MR. BAILEY:  THANK YOU, YOUR HONOR.

26    THE COURT:  ACCEPTABLE?

1        MR. NEWHOUSE:  THANK YOU FOR YOUR TIME.

2        THE COURT:  THANK YOU.

3        MR. PALMER:  SEE YOU IN SEPTEMBER.

4        THE COURT:  I THINK MR. BAILEY IS OR ISN'T GOING TO

5  GIVE YOU A COPY.

6        MR. BAILEY:  THEY'RE ALL GOING TO GET SERVED WITH

7  IT, THAT WAS THE COURT'S COURTESY COPY.

8                (ADJOURNMENT.)

9  ///

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**LISA S. ROULY, CRR, RPR, CSR NO. 9524**

## REPORTER'S CERTIFICATE

STATE OF CALIFORNIA )
                     )  SS.
COUNTY OF ORANGE     )

        I, LISA S. ROULY, CRR, RPR, CSR NO. 9524,
OFFICIAL COURT REPORTER IN AND FOR THE SUPERIOR COURT OF THE
STATE OF CALIFORNIA, COUNTY OF ORANGE, DO HEREBY CERTIFY;

        THAT THE FOREGOING REPORTER'S TRANSCRIPT IS A
FULL, TRUE AND CORRECT TRANSCRIPT OF MY SHORTHAND NOTES
THEREOF, AND IS A FULL, TRUE AND CORRECT STATEMENT OF THE
PROCEEDINGS HAD IN SAID CAUSE.


        DATED: __JUNE 03, 2011__


_____

LISA S. ROULY, CRR, RPR, CSR NO. 9524
OFFICIAL COURT REPORTER